**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-02398-RM-NYW

CYNTHIA MULLEN,

      Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF ADAMS, COLORADO;
RICHARD A. REIGENBORN, in his official capacity as the Sheriff of the County of Adams; and
WELLPATH, LLC,

      Defendants.

_____

**ADAMS COUNTY DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**
_____

      The Adams County Defendants' motion to dismiss challenges certain legal assumptions made by Ms. Mullen's First Amended Complaint (FAC) (ECF 16) about the nature of Rehabilitation Act claims as they apply to the circumstances of her short-period of incarceration. These legal issues are critical to her claims. If she is incorrect about even one of them, some or all of her claims must fail. Further factual discovery will not change that. Because the Rehabilitation Act does not countenance the kinds of legal claims Ms. Mullen advances against the Adams County Defendants, the Court should dismiss her complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

**LEGAL STANDARD**

      Ms. Mullen cites to a pre-*Twombly* legal standard for the motion to dismiss. The "no set of facts" standard quoted from *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144,

1149 (10th Cir. 2001), was based on *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). *See Stidham*, 265 F.3d at 1149, *citing Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999), *quoting Conley*, 355 U.S. at 45-46. *Conley* was overruled by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). *Twombly* replaced the "no set of facts" standard with a plausibility standard. As explained in the Supreme Court's subsequent decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), plausibility requires that the well-pled factual allegations allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678. "The burden is on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). As *Iqbal* made clear, attaching a label—such as "intentional discrimination"—to alleged conduct is not enough to meet the plausibility standard. *See Iqbal*, 556 U.S. at 663-64 (conclusory allegations not enough to plausibly allege purposeful discrimination on prohibited grounds); *see also All States Shuttle, LLC v. Sopkin*, No. 04-cv-01972-MEH-PAC, 2006 U.S. Dist. LEXIS 66955, *14-15 (D. Colo. Sept. 19, 2006) (merely labeling conduct as intentional discrimination is not enough to survive a motion to dismiss and collecting cases).

**ARGUMENT**

Ms. Mullen's first amended complaint proceeds on three faulty assumptions about the nature of Rehabilitation Act claims in non-employment cases: (1) that any governmental subunit (here the BOCC) that handles funding or other support for another governmental official (*i.e.*, the Sheriff) is, therefore, responsible for that official's purported failures under the Rehabilitation Act; (2) the failure to provide particularized accommodations for deafness or physical disabilities is

2

tantamount to intentional discrimination; and (3) governmental subunits are vicariously liable for the actions of their employees and agents. Each of these assumptions are incorrect as a matter of law and is fatal to Ms. Mullen's claims against the Adams County Defendants.

### I. As a Matter of Law, the BOCC Is Not Responsible for Policies or Practices at the Detention Facility.

Other than generally alleging that the both BOCC and the Sheriff receive federal funds, Ms. Mullen does not identify the sources or destinations of that funding, or its purpose(s). (FAC ¶¶ 10 & 13.) Part of Ms. Mullen's argument regarding the BOCC seems to be that merely because it is the recipient of some federal funding (perhaps wholly unconnected to the Detention Facility), it is responsible for the actions of every other governmental subunit that receives federal funds (whether related or not). But that is not the law.

The Rehabilitation Act's definition of "program or activity" was "not intended to sweep in the whole state or local government whenever one subdivision discriminates." *Arbogast v. Kansas*, 789 F.3d 1174, 1185 (10th Cir. 2015) (quotation omitted). "Rather, courts interpret the phrase 'program or activity' to only cover all the activities of the department or the agency receiving federal funds." *Id*. (quotation omitted). "When courts consider whether a particular subunit of state government is an independent department under the Rehabilitation Act, they look to the state's characterization of the subunit under state law." *Id*.

Ms. Mullen conclusorily alleges that the BOCC "owns, operates, and controls the Adams County Sheriff's Office[.]" (FAC ¶ 8.) *See Lopez v. Peapod, LLC*, No. 19 Civ. 9906 (KPF), 2021 WL 1108559, *4 n.4 (S.D.NY. Mar. 23, 2021) (holding in ADA case that allegation the defendant "owns, operates and/or controls" a business was conclusory because not supported by sufficient facts). She then inconsistently alleges that both the BOCC and the Sheriff simultaneously "own[],

3

operate[], and control[]," the Detention Facility. (FAC ¶¶ 9 & 12.) Both allegations are incorrect as a matter of law. Under Colorado law, the Sheriff is a separate constitutional officer elected to four-year terms. COLO. CONST., Art. XIV, §§ 8 & 8.5. He possesses both inherent and statutory powers that are not subject to interference by the BOCC. *See People v. Buckallew*, 848 P.2d 904, 909 (Colo. 1993). In particular, by state statute, the Sheriff, not the BOCC, runs the Detention Facility. Colo. Rev. Stat. §§ 17-26-101 to 103 & 30-10-511. By state statute, the Sheriff, not the BOCC, is responsible for the conduct of his deputies. Colo. Rev. Stat. § 30-10-506. *See Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002); *see also Tunget v. Bd. of Cty. Comm'rs*, 992 P.2d 650, 652 (Colo. App. 1999). In other words, despite what may be the case in other states (or in home rule municipalities), here the BOCC does not delegate power to the Sheriff as to policies and practices at the Detention Facility. That power is directly reposed in the Sheriff.

Ms. Mullen does not address these Colorado statutes. Instead, she argues the BOCC's statutory powers over appropriations and contract approval obligate it to dictate policy for the Detention Facility and the third-party medical provider, Wellpath. (Resp. at 3-4, citing Colo. Rev. Stat. § 30-11-107(1)(aa) & (2)(a).) Ms. Mullen, however, misinterprets both statutory provisions.

The BOCC does annually approve the Sheriff's budget pursuant to Colo. Rev. Stat. § 30-11-107(2)(a). But the BOCC's power over "appropriations" is preconditioned on receiving "appropriate budget recommendations each year" from the county officials. *Id.* Ms. Mullen does not allege either that the Sheriff requested additional funds for Rehabilitation Act purposes in the budget process, or that the BOCC refused to grant it. Ms. Mullen simply assumes that the Sherriff's alleged violation of the Act was due to a lack of requested funding. But no plausible non-conclusory allegation is made supporting that point. In any event, the BOCC's powers (whether

4

over appropriations or property) do not give it power over the Sheriff's policies or their implementation at the Detention Facility; control over which is conveyed to him by specific statutes. *See Richart v. Bd. of Cty. Comm'rs*, 33 P.2d 971, 972-73 (Colo. 1934) (board's general power over property under predecessor statute to Section 107(1)(a) must yield to Sheriff's specific statutory powers); *Terry v. Sullivan*, 58 P.3d 1098 (Colo. App. 2002) (board's statutory right of inspection of physical condition of jail does not convey managerial control over either the sheriff or the detention center and its staff).

As for the statutory subsection cited by Ms. Mullen regarding the BOCC's power over county contracts, Colo. Rev. Stat. § 30-11-107(1)(aa) imposes only a general procedural duty. The subsection relates to "policies and procedures regarding *entering into contracts* binding on the county[.]" *Id.* (emphasis added). In other words, the subsection governs the contract-making process. It does not grant the BOCC backdoor discretionary control over a county official's departmental polices that otherwise lie within his statutory purview. The County may set policies that allow it to review a contract for form or for financial impact before agreeing to stand behind its financial obligations. But, again, that does not give the BOCC the power to dictate internal policies and procedures over functions that are granted to the Sheriff by statute. *See Richart*, 33 P.2d at 972-73. The most the BOCC can do under such powers is what it did in this case, which is require its contracting parties to abide by federal law and avoid discrimination. But that doesn't make the BOCC responsible for alleged discrimination by those contracting parties, especially where they operate under the direction of the Sheriff.

Nor is this case akin to the cases cited by Ms. Mullen where a party seeks to wholly avoid Rehabilitation Act coverage by delegating out their legal responsibilities through contract and,

5

thereby, separating the receipt of funds from the performance of the conduct at issue. If Ms. Mullen had a legally valid Rehabilitation Act claim based on the facts as alleged (which she does not), such a claim would lie against the Sheriff in his official capacity. But none of the cases cited by Ms. Mullen regarding the definition of "operation" or "control" under 29 U.S.C. § 794(b) impose liability on an official or entity for merely exercising final approval over appropriations or approving a third-party contract. (Resp. at 2-3.) The holding of those cases is only that responsibility for compliance must rest somewhere—not that it must rest everywhere.

Ms. Mullen's reliance on *Anglin v. City of Aspen*, 552 F. Supp. 2d 1205 (D. Colo. 2008), is also misplaced. Even assuming *Anglin* was rightly decided (and the BOCC would argue it was not, *see L.A. County v. Humphries*, 562 U.S. 29, 35-36 (2010) (emphasizing only the actual decisionmaker is liable under *Monell*)),[1] *Anglin* is a Section 1983 case with a wholly different set of statutory triggers and available theories. *Anglin* itself relies on that difference as it purports to apply a *Monell* analysis, while acknowledging such a theory is unavailable in ADA claims. *See* 552 F. Supp. 2d at 1216 (applying *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). Ms. Mullen offers no legal authority for using Section 1983 to save a Rehabilitation Act claim.[2]

---

[1] *See also Estate of Blodgett v. Correct Care Sols., LLC*, No. 17-cv-2690-WJM-NRN, 2018 WL 6528109, *22-23 (D. Colo., Dec. 12, 2018) (reaching the opposite conclusion to that of *Anglin* in Section 1983 case and dismissing a board of county commissioners); *Isenbart v. Bd. of Cty. Comm'rs of Kit Carson Cty.*, No. 11-cv-03240-LTB-BNB, 2012 U.S. Dist. LEXIS 137542, *19-22 (D. Colo. Sept. 25, 2012) (same).

[2] Ms. Mullen asserts, without qualification, that "[t]he Parties agree that the courts should construe the Rehabilitation Act and the ADA similarly." (Resp. at 3 n.1.) This is not so. As detailed in the motion to dismiss, the Rehabilitation Act incorporates ADA standards only in the employment context. (Mot at 9-10, discussing 29 U.S.C. § 794(d).) This not an employment case. The applicable analogous standard in non-employment cases is Title VI. *See* 29 U.S.C. § 794a(a)(2).

Ms. Mullen's allegations against the BOCC ignore countervailing statutory duties that control over the interferences she draws from Colo. Rev. Stat. § 30-11-107. Nor does she allege sufficient predicate facts from which a court can reasonably draw those inferences, even assuming the statutes operated the way she contends. Neither the BOCC's temporary pass-through receipt of federal funds nor its receipt of federal funds for other programs obligates the BOCC to direct policy and procedure at the Detention Facility. Nor does its limited role in the third-party contracting process. The BOCC is not responsible for policies or practices at the Detention Facility as a matter of law and should be dismissed from this action.

## II.     Ms. Mullen's Failure to Accommodate Allegations Do Not Rise to the Level of Intentional Discrimination Under Title VI's Standard.

Title VI (and Title IX) claims require the defendant "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to" the programs at issue. *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003) (quotation omitted); *see* 29 U.S.C. § 794a(a)(2).

Ms. Mullen concedes in principle that the Rehabilitation Act requires Ms. Mullen to plead intentional discrimination, which she argues the First Amended Complaint does. (Resp. at 6.) The First Amended Complaint, however, does not plead concrete factual allegations (taken as true) that plausibly suggest either the Sheriff or the BOCC intentionally discriminated against Ms. Mullen sufficient to state a claim under Title VI's standard for discrimination.

To begin with, Ms. Mullen's complaint imputes the conduct of Sheriff's deputies and Wellpath employees during the short period of her incarceration to the Sheriff (and the BOCC). Ms. Mullen, however, did not directly interact with either the Sheriff or the BOCC. Her claim,

7

therefore, presupposes vicarious liability. As argued in Section III below, that theory is unavailable for Rehabilitation Act claims.

Setting the aside the issue of vicarious liability for the moment, the First Amended Complaint is full of allegations regarding the Detention Facility's alleged failures to reasonably "accommodate" Ms. Mullen during her incarceration by not immediately providing her with her preferred accommodations. (FAC ¶¶ 3, 11, 14, 50, 58, 59, 186, 196.) Her response to the motion to dismiss follows suit. (*See*, *e.g.*, Resp. at 4, 6.) "Failures to accommodate," however, are not synonymous or coextensive with intentional discrimination. *See*, *e.g.*, *Lee v. District of Columbia*, 920 F. Supp. 2d 127, 132-33 (D.D.C. 2013) ("Claims of discrimination under the ADA can take one of four forms: intentional discrimination, disparate impact, hostile work environment, and failure to accommodate.") (citations omitted). To the contrary, as indicated by the Supreme Court in *Southeastern Community College v. Davis*, the Rehabilitation Act ordinarily does not require affirmative action from federal funding recipients. 442 U.S. 397, 410-11 (1979) (Section 504 allows for lawful refusals to extend affirmative action); *Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("[T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit *may* have to be made.") (emphasis added). The narrow kinds of failures to accommodate that rise to the level of intentional discrimination are those failures that bespeak deliberate indifference–*i.e.*, recklessness. *See Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012) (Deliberate indifference is an "exacting standard" that "plainly requires more than gross negligence.") (quotation omitted). Knowledge of a disability is not enough to establish deliberate indifference, nor is inefficient communication. *See Friedson v. Shoar*, 2021 U.S. App. LEXIS 33081, \*11 (11th Cir. Nov. 8, 2021) (to satisfy deliberate indifference standard, it is not enough to

show a deputy had knowledge of the plaintiff's deafness or that there had been a miscommunication, but rather that the deputy knew they would be unable to communicate effectively going forward.").

Here, based on Ms. Mullen's own allegations (which are to be taken as true), the Sheriff's deputies and Wellpath employees repeatedly made attempts to accommodate her to at least some limited success during the short period of her overnight incarceration before her transfer to the courthouse where an interpreter was provided. Sheriff's deputies attempted to communicate with her via fingerspelling and writing. (FAC ¶¶ 133-34.) In addition, they provided her a video that effectively explained the prison intake process, as well as access to video phone. (FAC ¶¶ 133-34.) As for her medical treatment, the Wellpath employees repeatedly made efforts at accommodation−with some success−through fingerspelling and writing. (FAC ¶¶ 139-141; *see also* Wellpath MTD (ECF 23) at 7.) In her response, Ms. Mullen ignores her own allegations plausibly suggesting she can communicate in writing at least to some degree. (FAC ¶¶ 113, 161.[3]) Rather, she challenges the effectiveness of those efforts in that 16-hour window. So be it. But that does not change the consequence of having made the allegations about the Defendants' efforts at accommodation; namely that it takes the Defendants' alleged failures out of the category of

---

[3] Although the Response cites to the FAC at ¶¶ 113-14 (Resp. at 18), Ms. Mullen never explains how paragraph 113 ("Ms. Mullen immediately wrote '[a]m deaf, I use sign language.'") is consistent with paragraph 114 ("Ms. Mullen was unable to effectively communicate through a written statement"); *compare also* paragraphs 27 & 28 with paragraph 161. The facial inconsistency between Paragraphs 113 and 114 as to Ms. Mullen's ability to communicate in writing (especially in the absence of any clarifying argument) is sufficient to render implausible any inference that Ms. Mullen cannot communicate in writing *at all*. This conclusion is borne out by Ms. Mullen's prior litigation history in *Mullen v. S. Denver Rehab., LLC*, No. 18-CV-01552-MEH, 2020 WL 2557501, at *9 (D. Colo. May 20, 2020), which she cites to in her Response (*see* Resp. at 3); although the Court need not rely on that decision to reach the same conclusion.

intentional discrimination. Making repeated efforts at accommodation, even if inefficient, is not deliberate indifference. *See Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009) (deliberate indifference requires, *inter alia*, a failure to act); *McCulley v. Univ. of Kan. Sch. of Med.*, 591 F. App'x 648, 651 (10th Cir. 2014) (unpublished).

Nor was the conduct alleged−which mostly consists of the lack of providing immediate access to Ms. Mullen's preferred accommodations−sufficiently "severe, pervasive and objectively offensive" that it deprived Ms. Mullen of access to the services or programs at issue. *See Bryant*, 334 F.3d at 934 (setting forth elements of Title VI and Title IX claims). Nowhere in her complaint does Ms. Mullen explain how her alleged treatment by Detention Facility staff deprived her of meaningful access to incarceration or interim inmate medical assessment, which were the core programs or services "offered" to Ms. Mullen. *See Makeen v. Colo.*, No. 14-cv-3452-WJM-CBS, 2016 U.S. Dist. LEXIS 186118, *24 (D. Colo. Sept. 16, 2016) (observing "Plaintiff does not allege that limitation in his participation at this single hearing denied him effective access to the court overall, nor how any limitations in the effectiveness of his note takers ultimately denied him a meaningful opportunity to appear and be heard in the courts" and dismissing claim). At most, the First Amendment Complaint only suggests that Ms. Mullen was treated evenhandedly with other non-deaf and non-disabled prisoners. The factual allegations as made do not plausibly suggest the kind of deliberate indifference to misconduct required for a Rehabilitation Act claim. Attaching the labels of "intentional discrimination" or "deliberated indifference" to the Detention Facility's alleged failures to provide the accommodations Ms. Mullen prefers does not alter the analysis. *See Iqbal*, 556 U.S. at 663-64.

As for her subsequent arguments against the Sheriff directly, Ms. Mullen conflates two different theories. She starts at a high level of generality and alleges the Sheriff was an official who failed to modify policies and practices, or failed to investigate necessary proper auxiliary aids. (Resp. at 10, *citing Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) and *Liese*, 701 F.3d at 349.) But she stops short of alleging the Sheriff personally knew Ms. Mullen was incarcerated, or knew of her disabilities, or knew of a pattern of severe mistreatment by Sheriff's deputies or Wellpath employees. *See Bryant*, 334 F.3d at 934 (Title VI and Title IX claims requires the defendant "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school") (quotation omitted). What Ms. Mullen drops out of the *Gebser* / *Liese* analysis is the issue of the imputation of knowledge−or more precisely, its unavailability. As *Liese* points out, the official must not only have the authority to correct the problem, but the personal knowledge of its existence coupled with his failure to correct it. 701 F.3d at 349-50. Here, Ms. Mullen only alleges "the Detention Facility *staff* knew" of her circumstances. (Resp. at 10 (emphasis added).) But that is not enough to invoke *Gebser* or *Liese* against the Sheriff (or the BOCC).

In addition, Ms. Mullen's allegations are not aimed at the creation of general policies and practices under the *ex ante* control of the Sheriff. She does not allege, for example, that the Detention Facility lacks general policies or procedures for either the provision of ASL translators for the deaf or physical accommodations for the physically disabled. (*Accord* FAC ¶¶ 196(b) (alleging failure to modify policies to accommodate Ms. Mullen).) Nor does she allege how the existing policies and procedures were inadequate, or even whether they were followed in her

11

particular case. Rather, in an attempt to claim intentional discrimination, (Resp. at 10), she directly connects each of these alleged failures to *her* particular circumstances. Ms. Mullen argues *the Sheriff* intentionally discriminated against *her* because he didn't personally investigate *her* needs or personally accommodate *her* particular disabilities during *her* particular overnight stay in the Detention Facility. (Resp. at 10.) And, again, she argues this without any allegation that the Sheriff personally had knowledge of some facts to know there was a "strong likelihood" that the policies he had in place would lead to the violation of Ms. Mullen's federal rights based on her specific circumstances. *See Barber v. Colorado Dept. of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009).

It is not intentional discrimination, however, for the Sheriff to adopt procedures for the accommodation of deaf and physically disabled inmates without personally and immediately conducting an individualized assessment of every prisoner admitted to the Detention Facility. Nor does the Rehabilitation Act require that level of personal tailoring (even under lower standards of liability)−let alone, on demand. *See Liese*, 701 F.3d at 343 (noting that "failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights"); *Tucker v. Tennessee*, 539 F.3d 526, 538 (6th Cir. 2008) (noting that § 35.160 does not "require that every potential auxiliary device be on standby so that whatever request a particular individual makes can be accommodated"), *abrogated on other grounds by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015); *Petersen v. Hastings Pub. Sch.*, 31 F.3d 705, 708-09 (8th Cir. 1994) (rejecting plaintiffs' argument that school district violated Title II by refusing to "utilize the signing system" of plaintiffs' choice); *Barnett v. Fairfax County School Bd.*, 927 F.2d 146, 154 (4th Cir. 1991) (school board not required to "provide every hearing-impaired student with his interpreter of choice at his base school, instead of at mainstreamed but centralized locations . . . .").

And yet, that's what Ms. Mullen's claim would require. In non-employment cases, the Rehabilitation Act requires only evenhanded treatment with other inmates. Based on the facts as alleged in the first amended complaint, the Sheriff more than met that standard.

### III. Neither Sheriff Reigenborn nor the BOCC May Be Held Vicariously Liable for the Alleged Conduct of Sheriff's Deputies (or Third-Parties) Towards Ms. Mullen.

Ms. Mullen's entire suit turns on the assumption that either the BOCC or the Sheriff in his official capacity is liable for the actions of others. In other words, without some form of vicarious liability, Ms. Mullen has not alleged sufficient knowledge or conduct to warrant Rehabilitation Act claims against either Adams County Defendant. If this were an employment case, that likely would not matter because ADA standards would govern and they allow for vicarious liability. But under the express language of 29 U.S.C. § 794a(a)(2), non-employment cases are different. They are governed by Title IX standards. *Id.* And Title IX does not allow for vicarious liability. See *Gebser*, 524 U.S. at 290. Ms. Mullen hardly argues with this.

Instead, she argues that the availability of vicarious liability under the Rehabilitation Act is "commonplace," is supported by an "over-whelming weight" of law, and is "well-established." (Resp. at 8 & 11.) This is true to a limited degree, but the volume of relevant cases is somewhat overstated. In any case involving an employment action, a court's application of vicarious liability is consistent with 29 U.S.C. § 794a(a)(2). *Accord Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999). Only in non-employment cases would the issue be squarely presented. Having said that, the Adams County Defendants acknowledge that in some non-employment cases courts have (incorrectly) adopted the ADA vicarious standard. *See*, *e.g.*, *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1129 (9th Cir. 2001); *Rosen v.*

13

*Montgomery County*, 121 F.3d 154, 157 n.3 (4th Cir. 1997). The Tenth Circuit, however, is not one of those courts.

The non-employment cases that allow for vicarious liability cited by Ms. Mullen, however, do not consider the language of 29 U.S.C. § 794a(a)(2) or the holding in *Gebser*. The value of that category of precedent in resolving the present argument, therefore, is limited. The one circuit court decision that has confronted the issue resolved it against the availability of vicarious liability. *See Liese*, 701 F.3d at 348-49 & n.10; *cf. Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019) (noting the open issue as to Title II of the ADA but declining to definitively resolve it). But even if the weight of authority were as Ms. Mullen argues it is, it still would not trump the express language of 29 U.S.C. § 794a(a)(2). This Court is not bound by the decisions of other circuits, *see Palmer v. Kaiser Found. Hosps. Tech. Risk Office*, No. 16-cv-2376-WJM-KMT, 2017 U.S. Dist. LEXIS 169735, *6 (D. Colo. Oct. 13, 2017), especially where their analysis is inconsistent with the statutory text or has been undercut by Supreme Court precedent.

The same is true of Ms. Mullen's public policy argument. She argues that applying the ADA vicarious liability standard across all classes of Rehabilitation Act cases would better advance the purpose of the Rehabilitation Act. (Resp. at 8.) But legislative purpose is established by statutory language, not in spite of it. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 403 (2010). Appeals to policy cannot trump the express and deliberately selective incorporation of ADA and Title VI standards reflected in 29 U.S.C. §§ 794(d) and 794a(a)(2), respectively.

## CONCLUSION

The Rehabilitation Act does not afford Ms. Mullen the relief she seeks for the conduct she

alleges against the Adams County Defendants as a matter of law. The Adams County Defendants, therefore, respectfully request Ms. Mullen's First Amended Complaint (ECF 16) be dismissed with prejudice.

DATED: January 3, 2022.

                                      Respectfully submitted,

                                      *s/Michael A. Sink*
                                      Michael A. Sink
                                      Assistant County Attorney
                                      Adams County Attorney's Office
                                      4430 S. Adams County Pkwy
                                      5th Floor, Suite C5000B
                                      Brighton, CO  80601
                                      Phone: (720) 523-6116
                                      Fax: (720) 523-6114
                                      msink@adcogov.org

**CERTIFICATE OF SERVICE**

I hereby certify that on January 3, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the PACER system which will send notification of such filing to all counsel of record.

*s/Michael A. Sink*
Michael A. Sink
Assistant County Attorney
Adams County Attorney's Office
4430 S. Adams County Pkwy
5th Floor, Suite C5000B
Brighton, CO  80601
Phone:  (720) 523-6116
Fax:  (720) 523-6114
msink@adcogov.org
