**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-02398-RM-NYW

CYNTHIA MULLEN,

     Plaintiff,

v.

BOARD OF COMMISSIONERS FOR ADAMS COUNTY, COLORADO,
RICHARD A. REIGENBORN, in his official capacity, and
WELLPATH LLC,

     Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

Magistrate Judge Nina Y. Wang

     This action is before the court on

     (1) Defendants Board of County Commissioners of the County of Adams, Colorado and
Richard A. Reigenborn ("Adams County Defendants") Motion to Dismiss Pursuant to
Fed. R. Civ. P. 12(b)(6) ("Adams County Motion to Dismiss"), [Doc. 22, filed
November 29, 2021]; and

     (2) Defendant Wellpath, LLC's ("Wellpath") Motion to Dismiss ("Wellpath Motion to
Dismiss" and together with the Adams County Motion to Dismiss, "Motions to
Dismiss" or "Motions"), [Doc. 23, filed December 7, 2021].

The undersigned considers the Motions to Dismiss pursuant to 28 U.S.C. § 636(b), the Order
Referring Case dated September 24, 2021, [Doc. 9], and the Memorandum dated December 8,
2021, [Doc. 24]. After reviewing the Parties' briefings, the entire case file, and the applicable case
law, I respectfully **RECOMMEND** (1) that the Adams County Motion to Dismiss be **GRANTED
IN PART AND DENIED IN PART**; and (2) that the Wellpath Motion to Dismiss be **GRANTED**.

## BACKGROUND

### I.     Factual Background

The following facts are drawn from the First Amended Complaint and Jury Demand ("First Amended Complaint"), [Doc. 16], and taken as true for the purposes of the instant Motions.   The allegations in this case arise from the arrest and alleged mistreatment of Plaintiff Cynthia Mullen ("Ms. Mullen" or "Plaintiff") during her detention in August 2020. [Doc. 16 at ¶ 1].  Ms. Mullen— who is deaf, physically disabled, and "cannot speak words"—relies on American Sign Language ("ASL") as her "preferred method of communication." [*Id.* at ¶¶ 1, 22–26, 30].  Ms. Mullen cannot write in, or understand sentences that are written in, English; nor can she "understand other people's verbal communication by reading lips." [*Id.* at ¶¶ 27–29].   Therefore, "[t]o understand English that is conveyed to Ms. Mullen, she requires an ASL interpreter." [*Id.* at ¶ 31].  In addition, due to amputations of her right leg and big toe on her left foot, Ms. Mullen requires the use of a wheelchair for transportation.  [*Id.* at ¶¶ 32–34].   Ms. Mullen also suffers from various other conditions.  *See* [*id.* at ¶¶ 35–41].

On August 24, 2020, around 4:30 p.m., Ms. Mullen was traveling in a vehicle to a doctor's appointment with two friends.  [*Id.* at ¶¶ 66–68].  One of the friends, Deborah Johnson, was the driver, while Ms. Mullen was in the front passenger seat, and the other friend, Susan Weiler, sat in the backseat.  [*Id.* at ¶¶ 69–70].  During the ride, Ms. Mullen and Ms. Weiler had a verbal and physical altercation, which left Ms. Mullen with bleeding wrists and resulted in Ms. Johnson pulling over and calling the Brighton Police Department, who were dispatched to the scene.  [*Id.* at ¶¶ 70–81].

When the officer, Officer Barfield, arrived, he "observed dried and wet blood on Ms. Mullen's wrists", and called an ambulance to treat her injuries.  [*Id.* at ¶¶ 84–85].  Officer Barfield

interviewed all three individuals.  First, he spoke with Ms. Johnson, who informed Officer Barfield that Ms. Mullen was deaf and required an ASL interpreter.  [*Id.* at ¶  86].  Next, Officer Barfield "attempted to interview Ms. Mullen in spoken English" and asked Ms. Johnson to translate his words to ASL.  [*Id.* at ¶¶ 87, 90].  Ms. Johnson explained "that she is not fluent in ASL and could not interpret for Ms. Mullen."  [*Id.* at ¶¶ 91–93].  In his report, Officer Barfield noted that "Ms. Mullen was able to say some words, but most [were] unintelligible" and she "would not go into more detail or tell [him] anymore about what happened inside the car."  [*Id.* at ¶¶ 88, 94].  Finally, Officer Barfield spoke with Ms. Weiler, who told the officer "that Ms. Mullen hit her on the jaw." [*Id.* at ¶¶ 96, 99].  Based on Ms. Weiler's statement, Officer Barfield thus "concluded that Ms. Mullen was the primary aggressor" and arrested Ms. Mullen.  [*Id.* at ¶¶ 101–02].

Ms. Mullen requested ASL interpreters at the police station, "but her requests were ignored."  [*Id.* at ¶ 104].  Ms. Mullen alleges she "did not understand the booking process or why she was being arrested" nor did she "understand if she was being charged or the extent of the charges."  [*Id.* at ¶¶ 106–07].  Before her incarceration, Ms. Mullen was transported to the Platte Valley Medical Center ("Medical Center") for treatment, and alleges she was unable to communicate during transport.  [*Id.* at ¶¶ 110–11].  When she arrived at the Medical Center, however, officers provided her a piece of paper and she "immediately wrote, '[a]m deaf, I use sign language.'"  [*Id.* at 113–14].  Ms. Mullen also alleges that "[n]o ASL interpreters were provided" while she was treated at the Medical Center.  [*Id*. at ¶¶ 115–16].

Ms. Mullen was then transported to the Detention Facility after the Medical Center cleared her for incarceration.  [*Id.* at ¶¶ 117–18].  Ms. Mullen alleges that "no ASL interpreters" were present at the Detention Facility upon her arrival; and the staff at the Detention Facility "transferred her to a holding cell in an old rickety wheelchair" which "caused Ms. Mullen physical pain" that

she could not describe to the staff due to the lack of ASL interpreters.  [*Id.* at ¶¶ 122–32].  Ms. Mullen also claims that "the Detention Facility's staff attempted to communicate with Ms. Mullen through a female officer, who knew how to sign individual letters (fingerspell) in ASL" but such attempts were "tedious and ineffective."  [*Id.* at ¶¶ 133–35].   Further, staff ignored Ms. Mullen's repeated requests for an ASL interpreter, and the female officer ultimately "became frustrated and gave up trying to communicate with Ms. Mullen."  [*Id.* at ¶¶ 136–38].  The staff also allowed Ms. Mullen to use a videophone to make one phone call to Ms. Johnson, but did not allow her to call anyone else or use the videophone to communicate with staff or other officers.  [*Id.* at ¶¶ 140–44].

Ms. Mullen also alleges that she was "forced to wait several minutes before she was able [ ] to get the attention of the Detention Facility's staff so that she could use the restroom"; and, upon her use of the restroom, she was "forced to wait for an extended period before an officer arrived to take ger back to the holding cell."  [*Id.* at ¶¶ 145–50].  After returning to her holding cell, Ms. Mullen attempted to communicate with staff "that she needed a specific bed due to her physical handicap" and "staff eventually brought Ms. Mullen a cot."  [*Id.* at ¶¶ 151–52].  However, the height of the cot was too low to the ground, which made it "impossible for [Ms. Mullen] to transfer from her wheelchair to the cot."  [*Id.* at ¶¶ 153–54].  Ms. Mullen alleges she was "forced to sit upright in the old rickety wheelchair overnight" after the staff "gave up trying to communicate with her about the height of the cot."  [*Id.* at ¶¶ 155–56].

The following morning, Detention Facility staff took Ms. Mullen to see a nurse who worked at the Detention Facility under a "contract for healthcare services between the Board, the Sheriff, and WellPath."  [*Id.* at ¶ 159].  Ms. Mullen was provided a dry erase board to communicate with the nurse, but claims that "[w]ritten English on a dry erase board is not an effective means of communication for [her]."  [*Id.* at ¶¶ 161–62].  Because of this ineffective communication, Ms.

Mullen alleges, "the nurse denied Ms. Mullen pain medication" and "attempted to give Ms. Mullen a shot for her diabetes, but it was not the correct shot." [*Id.* at ¶¶ 163–64]; *see also* [*id.* at ¶ 165]. Later that morning, another nurse visited Ms. Mullen to administer an insulin shot, and, again, there was no interpreter available. [*Id.* at ¶¶ 170–71]. Thereafter, Ms. Mullen was taken to the Adams County Courthouse, where the court provided her an ASL interpreter. [*Id.* at ¶ 178]. Ms. Mullen was in the custody of the Adams County Sheriff's Department for approximately sixteen hours. *See* [*id.* at ¶ 2].

In the First Amended Complaint, Ms. Mullen asserts three claims for relief under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act"). The First Claim is against the Board of County Commissioners of the County of Adams, Colorado ("Board"); the Second Claim is against Defendant Reigenborn ("Mr. Reigenborn" or "Defendant Reigenborn"); and the Third Claim is against Wellpath. *See* [Doc. 16 at ¶¶ 181–210]. Ms. Mullen claims that she "has suffered and will continue to suffer damages" as a result of the conduct alleged in the First Amended Complaint, [*id.* at ¶ 80], and seeks "compensatory damages, attorneys' fees and costs and any other relief to the fullest extent by law and in an amount to be determined at trial", [*id.* at ¶¶ 190, 200, 210].

## II.   Procedural Background

Ms. Mullen initiated this action on September 3, 2021, by filing a Complaint and Jury Demand ("Complaint") against the Board. [Doc. 1]. This action was ultimately reassigned to the Honorable Raymond P. Moore and referred to the undersigned Magistrate Judge. *See* [Doc. 2; Doc. 6; Doc. 7; Doc. 8; Doc. 9]. On October 26, 2021, the court held a Scheduling Conference, and established a discovery deadline of April 25, 2022, and a dispositive motion deadline of June 6, 2022. [Doc. 14 at 6].

On November 8, 2021, Ms. Mullen filed the First Amended Complaint, which remains the operative pleading in this action. [Doc. 16]. The First Amended Complaint added as party-defendants Wellpath and Mr. Reigenborn in his official capacity as the Sheriff of Adams County. *See* [*id.*]. On November 29, 2021, the Adams County Defendants filed the Adams County Motion to Dismiss. [Doc. 22]. On December 7, 2021, Wellpath filed the Wellpath Motion to Dismiss. [Doc. 23]. Ms. Mullen responded to the Motions on December 20, 2021 and January 5, 2022, respectively. [Doc. 25; Doc. 30]; *see also* [Doc. 26; Doc. 28]. The Adams County Defendants replied on January 3, 2022, [Doc. 29], and Wellpath replied on January 19, 2022, [Doc. 31].

On February 4, 2022, Wellpath filed a Motion to Stay Discovery ("Motion to Stay"), seeking to stay discovery pending resolution of the Wellpath Motion to Dismiss. [Doc. 33]. On February 25, 2022, the undersigned denied the Motion to Stay. [Doc. 38]. The same day, Plaintiff filed an Unopposed Motion to Modify the Scheduling Order and Stay the Expert Designation Deadline ("Motion to Modify"), [Doc. 39], wherein she sought a stay of the deadline to designate expert witnesses because, *inter alia*, (1) "due to the timing of the Amended Complaint and the additional parties to the Amended Complaint, Defendants Wellpath and Reigenborn have not yet had the opportunity to participate with Plaintiff in framing a scheduling order"; and (2) Plaintiff had "not yet received initial disclosures from Defendants Wellpath and Reigenborn, which will be important in framing a discovery schedule." [*Id.* at ¶ 11]. The court subsequently granted the Motion to Modify and ordered Wellpath and Defendant Reigenborn to file a Joint Status Report by March 17, 2022, regarding the status of their discovery exchanges, including when those Defendants intended to exchange their Rule 26(a)(1) disclosures. [Doc. 41]. Wellpath and Defendant Reigenborn timely filed the Joint Status Report, [Doc. 42], along with a proposed Amended Scheduling Order, [Doc. 43]. This court subsequently set this matter for a supplemental

Scheduling Conference, which it held on April 14, 2022.  *See* [Doc. 44; Doc. 45; doc. 47; Doc. 48].  The current case deadlines are as follows: fact discovery is due September 14, 2022; Plaintiff's designations of affirmative experts are due October 14, 2022; Defendants' designations of affirmative experts are due November 14, 2022; designations of rebuttal experts for all Parties are due November 28, 2022; expert discovery is due December 28, 2022; and dispositive motions are due January 27, 2023.  *See* [Doc. 47 at 1–2].  The Motions to Dismiss are thus ripe for Recommendation.

## LEGAL STANDARDS

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  A plaintiff may not rely on mere labels or conclusions, and a "formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "'across the line from conceivable to plausible.'" (citation omitted)).  The court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Section 504 of the Rehabilitation Act protects qualified, disabled individuals from being, solely by reason of their disability, excluded from the participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).  To state a prima facie case under Section 504 of the Rehabilitation Act, a plaintiff must show that "(1) [she] is handicapped under the Act; (2) [s]he is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff."  *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008); *see also Cohon ex rel. Bass v. New Mexico Dept. of Health*, 646 F.3d 717, 725 (10th Cir. 2011).

## I.      Adams County Motion to Dismiss

For the purposes of the instant Motion, the Adams County Defendants assume that Plaintiff has sufficiently alleged that "she is an 'individual with a disability' who has been 'subjected to discrimination' while incarcerated in a 'program or activity' – *i.e.*, the Adams County Detention Facility – that received Federal financial assistance."  [Doc. 22 at 5 (footnote omitted)].  But the Adams County Defendants contend that Plaintiff's First and Second Claims against them should be dismissed on three grounds.  *See* [Doc. 22].  First, they argue that the Board is not a proper party to this suit.  *See* [*id.* at 6–8].  Second, they argue that the Rehabilitation Act does not provide a cause of action in non-employment cases based on a failure-to-accommodate theory of liability, the Act only provides a cause of action for intentional discrimination, and Plaintiff fails to sufficiently allege intentional discrimination.  *See* [*id.* at 8–14].  Third, they argue that the Rehabilitation Act does not impose liability under a vicarious liability theory, and therefore the

Adams County Defendants are not liable for the acts of prison officials or third-party medical providers who are alleged to have violated the Act. *See* [*id.* at 14–18].

The court will first address the Adams County Defendants' argument that the Board is not a proper party to this suit under the Rehabilitation Act. *See* [*id.* at 6–8]. Second, the court will address whether a party may assert a claim under the Rehabilitation Act based on a failure to accommodate theory of liability. *See* [*id.* at 8–11]. Third, the court will discuss whether Plaintiff has sufficiently alleged intentional discrimination in the First Amended Complaint. *See* [*id.* at 12–14]. Finally, the court will turn to the Adams County Defendants' argument that a party may not assert a vicarious liability theory under the Rehabilitation Act. *See* [*id.* at 14–18].

### A.   Whether the Board Constitutes a "Program or Activity" to Render it a Proper Defendant under the Rehabilitation Act

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any *program or activity* receiving Federal financial assistance . . ." 29 U.S.C. § 794(a) (emphasis added). The Act defines "program or activity" to include "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance." 29 U.S.C. § 794(b).

Notably, the definition of "program or activity" under the Rehabilitation Act is "'not intended to sweep in the whole state or local government' whenever one subdivision discriminates." *Arbogast v. Kansas, Dept. of Lab.*, 789 F.3d 1174, 1184 (10th Cir. 2015) (quoting *Schroeder v. City of Chicago,* 927 F.2d 957, 962 (7th Cir.1991)). Instead, "courts interpret the phrase 'program or activity' to 'only cover[ ] all the activities of the department or the agency receiving federal funds.'" *Id.* (quoting *Lovell v. Chandler,* 303 F.3d 1039, 1051 (9th Cir. 2002).

"When courts consider whether a particular subunit of state government is an independent department under the Rehabilitation Act, they look to the state's characterization of the subunit under state law." *Id.* (first citing *Sharer v. Oregon*, 581 F.3d 1176, 1178 (9th Cir. 2009); and then *Haybarger v. Lawrence Cnty. Adult Probation & Parole*, 551 F.3d 193, 201 (3d Cir. 2008)). Courts also "consider the degree of financial and administrative independence of the subunit." *Id.*

In the instant Motion, the Adams County Defendants argue that "the Board is not a proper party to this suit because it does not oversee the operations of the Detention Facility of the Sheriff's Deputies." [Doc. 22 at 6 (capitalizations omitted)]. Specifically, the Adams County Defendants contend that, as a matter of law, "the Sheriff, not the Board of County Commissioners, has exclusive control over policies at the Detention Facility" and "the right to supervise and control the Sheriff's deputies". [*Id.* at 7 (quotations omitted)]. Based on the allegations in the First Amended Complaint, the Adams County Defendants continue, "Sheriff Reigenborn in his official capacity is the only proper defendant to Ms. Mullen's claims arising out of policies or conduct at the Detention Facility . . ." [*Id.* at 8]. The Adams County Defendants further assert that Plaintiff does not allege "that the Sheriff made a budgetary request to the Board related to the provision of auxiliary aids for the disabled, which the Board declined" and, therefore, the Board "should be dismissed with prejudice because they are not legally responsible for any alleged conduct at the Detention Facility merely because they provide general funds to the Sheriff." [*Id.* at 8]. The court respectfully agrees with the Adams County Defendants.

Under Colorado law, the county sheriff is a separate and distinct position from the board of county commissioners. *See Bristol v. Bd. of Cty. Comm'rs,* 312 F.3d 1213, 1219 (10th Cir. 2002) (citing COLO. CONST. art XIV, §§ 6, 8); *see also Terry v. Sullivan,* 58 P.3d 1098, 1102 (Colo. App. 2002). "[T]he Board [of County Commissioners] does not exercise managerial control

10

over either the sheriff or the detention center and its staff."  *Id.*; *see also* Colo. Rev. Stat. § 30-10-511 ("[T]he sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself through a deputy or jailer.").  "The Board of Commissioners is granted certain enumerated powers which do not include management of county jails."  *Sisneros v. Cty. of Pueblo*, No. 09-cv-01646-PAB-MJW, 2010 WL 1782017, at *3 (D. Colo. May 3, 2010) (first citing Colo. Rev. Stat. § 30-11-107; and then *Richart v. Bd. of Comm'rs of Boulder Cty.,* 33 P.2d 971, 972–73 (Colo. 1934) (stating that when interpreting the predecessor statutes, that the "general powers conferred upon the board with reference to the county's property generally, when in conflict with the special, particular powers conferred upon the sheriff with reference to jails, must yield to the latter. . . .")); *cf. Bristol*, 312 F.3d at 1219 ("Because the Board of County Commissioners has no control over the Sheriff's employees, the Board is not liable for the negligent acts of the Sheriff's employees."); *Anglin v. City of Aspen, Colo.*, 552 F. Supp. 2d 1205, 1216 (D. Colo. 2008) (explaining that "*Bristol* addressed the limited issue of whether county commissioners were the 'employer' of a sheriff's deputy for purposes of the Americans with Disabilities Act"); *Montez v. Romer*, 32 F. Supp. 2d 1235, 1239 (D. Colo. 1999) ("As a general matter, courts have construed the Rehabilitation Act and the [ADA] similarly.").

In the First Amended Complaint, Plaintiff alleges generally that the Board "is a recipient of federal financial assistance within the meaning of Section 504."  [Doc. 16 at ¶ 10]; *see also* [*id.* at ¶¶ 50, 183].  In her Response to the Adams County Defendants' Motion, Plaintiff argues that "[t]o determine whether a defendant operates a 'program or activity' under the [Rehabilitation Act], the courts routinely utilize Title III of the ADA's 'operation' framework."  [Doc. 25 at 2–3 (citing *Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir. 1995)].  Plaintiff therefore insists that the Board is a proper defendant in this action because it constitutes a program or activity

that "exerts control over the accommodations sought in this case." [Doc. 25 at 2–4 (capitalizations omitted)].

However, neither *Neff* nor the other cases cited by Plaintiff (which rely upon *Neff*) support her argument. Indeed, *Neff* did not address the definition of "programs or activities"—instead, the Fifth Circuit addressed the issue of "whether a franchisor with limited control over a franchisee's store 'operates a place of public accommodation' within the meaning of section 302(a)" of the ADA. *Neff*, 58 F.3d at 1066. Section 302(a) of the ADA, in turn, provides that "[n]o individual shall be discriminated against on the basis of disability . . . by any person who owns, leases (or leases to), or *operates a place of public accommodation*." 42 U.S.C. § 12182(a) (emphasis added). On the other hand, Section 504 of the Rehabilitation Act applies to "any program or activity receiving Federal financial assistance . . . " 29 U.S.C. § 794(a). Indeed, courts "look to decisions construing the Rehabilitation Act to assist [ ] in interpreting *analogous* provisions of the ADA." *Patton v. TIC United Corp.*, 77 F.3d 1235, 1245 (10th Cir. 1996) (emphasis added). And for the purposes of the instant Motion, Section 504 of the Rehabilitation Act is analogous to the provisions of Title II of the ADA, not Title III. *Compare* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability . . . be subjected to discrimination under any *program or activity* receiving Federal financial assistance . . ." (emphasis added)) *with* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be *denied the benefits of the services, programs, or activities of a public entity*, or be subjected to discrimination by any such entity." (emphasis added)). Thus, Plaintiff's reliance upon *Neff's* analysis of Title III of the ADA is inapplicable to her arguments regarding the scope of Section 504 of the Rehabilitation Act.

Plaintiff also argues that, under Colorado law, "there is a question of fact as to whether the [Board] controls the Sheriff's ability to provide accommodations for disabled individuals." [*Id.* at 3]. Specifically, Plaintiff argues that the Sheriff's budget is governed by C.R.S. § 30-11-107(2)(a), which provides in relevant part that,

> the final budget determination of each board of county commissioners shall be binding upon each of the respective offices, departments, boards, commissions, other spending agencies of the county government, and other agencies which are funded in whole or in part by county appropriations.

[*Id.*]. Based on this language, Plaintiff maintains that she has adequately "pled facts alleging that the [Board] failed to provide the budget for necessary auxiliary aids and accommodations"—in particular, an ASL interpreter "or appropriate physical accommodations to allow [P]laintiff to sleep." [Doc. 25 at 4 (citing [Doc. 16 at ¶¶ 9, 11, 44–49, 122, 124–38, 144, 152–58])]. However, Plaintiff does not allege in the First Amended Complaint either that (1) the Sheriff requested funds specifically earmarked for Rehabilitation Act purposes in the budget process, or (2) that the Board refused to grant it. *See* [Doc. 16]. Instead, she alleges the following:

- "The Board controls the budget for Defendant Richard A. Reigenborn, in his capacity for the Sheriff for Adams County." [*Id.* at ¶ 44];

- "The Board's control of the budget for the Sheriff includes control of furnishings and appliances that are provided by the Sheriff at the Detention Facility." [*Id.* at ¶ 45];

- "The Board's control of the budget for the Sheriff includes control over contracts for maintenance, repair, and other services for the Sheriff at the Detention Facility." [*Id.* at ¶ 46];

- "The Board's control of the budget for the Sheriff specifically includes, but is not limited to, control of third-party contractors for the provision of healthcare services provided by the Sheriff at the Detention Facility." [*Id.* at ¶ 47];

- "The Board's control for the budget includes the Detention Facility's contract with Defendant WellPath, LLC for the provision of healthcare services that are provided at the Detention Facility."  [*Id.* at ¶ 48]; and

- "The Board's control of the budget includes ensuring that there are funds available for the provision of reasonable accommodations by the Sheriff for individuals who are detained at the Detention Facility."  [*Id.* at ¶ 49].

The First Amended Complaint then concludes, without any basis, that the Board "[i]ntentionally discriminat[ed] against Ms. Mullen by *restricting the budget* for the provision of ASL interpreters at the Detention Facility" and "*restricting the budget* for the provision of physical accommodations for amputees at the Detention Facility."  [*Id.* at ¶ 186 (emphasis added)].  Thus, even if Plaintiff's purported "'operation framework" applied to this court's analysis of whether the Board is a proper party under the Rehabilitation Act—which, as explained above, it does not—Plaintiff's conclusory allegations that the Board controlled the Sheriff's budget do not adequately support her conclusions that the Board, in turn, restricted the budget as to accommodations for detainees.  *See Twombly*, 550 U.S. at 555 (explaining that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions"); *see also* [Doc. 29 at 4 ("Ms. Mullen does not allege either that the Sheriff requested additional funds for Rehabilitation Act purposes in the budget process, or that the BOCC refused to grant it. Ms. Mullen simply assumes that the Sherriff's alleged violation of the Act was due to a lack of requested funding. But no plausible non-conclusory allegation is made supporting that point.")].

Plaintiff also argues that the Board exerts control over the accommodations sought in this case under Colo. Rev. Stat. § 30-11-107(aa), which grants the Board the authority

> [t]o establish policies and procedures regarding entering into contracts binding on the county, and to delegate its power to enter into such contracts pursuant to such

policies and procedures, where amounts specified in such policies and procedures and where such contracts otherwise comply with limits and requirements set forth in such policies and procedures.

[Doc. 25 at 4]. Based on that section of the statute, Plaintiff argues that the Board "is responsible for contracting with and/or creating policies and procedures for contracting with third-party providers"; and, "[i]n this case, the [Board] was responsible for contracting with, or ensuring that its policies were followed, with respect to the Detention Facility's contract with Defendant Wellpath, LLC." [Doc. 25 at 4]. Plaintiff further argues that she "specifically pled facts demonstrating that the [Board] contracted with Wellpath, LLC, who refused to provide auxiliary aids and services to Plaintiff during multiple medical visits." [*Id.*]. In support of her arguments, Plaintiff cites to *Anglin v. City of Aspen, Colo.*, 552 F. Supp. 2d 1205, 1216 (D. Colo. 2008), for the proposition that the Board may be held liable for the "intentional and deliberate acts . . . of the sheriff's employees . . ." [Doc. 25 at 5]. This court is not persuaded.

Indeed, Plaintiff acknowledges that *Anglin* did not involve a claim under the Rehabilitation Act, *see* [*id.*]—instead, that case involved a Section 1983 claim, where "[m]unicipal liability is limited to deprivations of federally protected rights caused by actions taken pursuant to official municipal policy or custom and '*attaches only where the decisionmaker possesses final authority to establish municipal policy* with respect to the action taken.'" *Anglin*, 552 F. Supp. 2d at 1216 (emphasis added). Moreover, the *Anglin* court explained that "reading the facts in the light most favorable to Plaintiff, [the] Sheriff [ ] *sets the official policy* relating to involuntary medical for [the] County" and the county commissioners "cannot escape potential shared liability with [the] Sheriff [ ] by arguing that he, alone, is responsible for the acts of his employees." *Id.* at 1216–17 (emphasis added).

Here, Ms. Mullen does not explain how the standard for municipal liability under Section 1983 for actions taken pursuant to a "policy or custom" applies to her claim against the Board under the Rehabilitation Act. As mentioned, the definition of "program or activity" under the Rehabilitation Act is "'not intended to sweep in the whole state or local government' whenever one subdivision discriminates." *Arbogast*, 789 F.3d at 1184 (quoting *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir.1991)). Rather, the court must "look to the . . . characterization" of the Board under Colorado law to determine whether it "is an independent department under the Rehabilitation Act." *Id.* And, as explained above, "[t]he Board of County Commissioners has certain enumerated powers and operation of the jail is not one of them." *Archuleta v. Adams Cty. Bd. of Cty. Comm'rs*, No. 07-cv-02515-MSK-CBS, 2011 WL 3799029, at *10 (D. Colo. June 14, 2011), *report and recommendation adopted,* 2011 WL 3809911 (D. Colo. Aug. 26, 2011).

In sum, I find that the Board is not a "program or activity" under the Rehabilitation Act and, therefore, **RECOMMEND** that the Adams County Defendants' Motion to Dismiss be **GRANTED** as to Plaintiff's First Claim against the Board.

### B.    Failure to Accommodate under the Rehabilitation Act

The court next addresses the Adams County Defendants' argument that the Rehabilitation Act "does not provide a private cause of action for the mere failure to accommodate." [Doc. 22 at 6]. The Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Similarly, Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Although Ms. Mullen does not assert her claims under Title II of the ADA, relevant here, "[a]s a general matter, courts have construed the Rehabilitation Act and the [ADA] similarly." *Romer*, 32 F. Supp. 2d at 1239; *see also Tivis v. Dowis*, No. 11-cv-02050-PAB-KMT, 2014 WL 4413216, at *6 (D. Colo. Sept. 8, 2014) ("Because '[t]he Rehabilitation Act is materially identical to and the model for the ADA,' the elements of claims asserted under the statutes are the same, except that the Rehabilitation Act requires that defendant receive federal funds." (quoting *Crawford v. Ind. Dep't of Corrs.*, 115 F.3d 481, 483 (7th Cir. 1997) *abrogated on other grounds as recognized in Erickson v. Bd. of Govs.*, 207 F.3d 945, 948 (7th Cir. 2000)); *compare PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001) ("Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals.") *with Arbogast*, 789 F.3d at 1182 ("Congress enacted the Rehabilitation Act of 1973 to combat discrimination targeted toward individuals with physical and mental disabilities.").

"Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016) (analyzing discrimination claim under Title II of the ADA).  In addition, Department of Justice regulations "require public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.'" *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007) (quoting 28 C.F.R. § 35.130(b)(7)).  Under Title II of the ADA, "a public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation." *J.V.*, 813 F.3d at 1299 (quoting

*Robertson*, 500 F.3d at 1197 ("When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim.")). Notably, the Tenth Circuit has assumed, without deciding, that the ADA may require reasonable accommodations of an individual's disability during an investigation or arrest. *See J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d 1255, 1261 (10th Cir. 2015). "For example, if a disabled individual uses a wheelchair, courts might require law enforcement officers to secure the wheelchair when making an arrest." *Id.*

Accordingly, this court assumes, for the purposes of the instant Motion, that Plaintiff may assert a failure-to-accommodate theory of liability under the Rehabilitation Act. *See Havens v. Colo. Dep't of Corrections*, 897 F.3d 1250, 1269 (10th Cir. 2018) (explaining that, in a Section 504 case, "[t]he plaintiff bears the burden of establishing that the defendant 'discriminated against the handicapped' in the offered program or service by failing to provide meaningful access to the program and service, 'such that the need for a remedial interactive process aimed at finding a reasonable accommodation was triggered.'" (citiation omitted)); *Partridge v. Smith*, No. 17-cv-02941-CMA-STV, 2020 WL 897653, at *6 (D. Colo. Feb. 25, 2020) (analyzing a failure-to-accommodate theory under the Rehabilitation Act and ADA together).

### C.   Whether Plaintiff Has Plausibly Alleged Intentional Discrimination by the Staff at the Detention Facility[1]

In addition to arguing that the Rehabilitation Act does not provide a cause of action based on a failure-to-accommodate theory of liability, the Adams County Defendants also argue the Act

---

[1] The court notes that Plaintiff has not brought her Rehabilitation Act claims against the Detention Facility staff. *See* [Doc. 16]. Nonetheless, an analysis regarding whether Plaintiff has plausibly alleged deliberate indifference by the Detention Facility staff is a necessary component of the question of the availability to Plaintiff of a vicarious liability claim against Defendant Reigenborn. *See A.V. through Hanson v. Douglas County Sch. Dist. RE-1*, No. 21-cv-0704-WJM-SKC, 2022 WL 504138, at *8 n.4 (D. Colo. Feb. 18, 2022).

only provides a cause of action for intentional discrimination, and Plaintiff fails to sufficiently allege intentional discrimination. *See* [Doc. 22 at 8–14].

As explained above, this court assumes, for the purposes of the instant Motion, that a plaintiff may assert a failure-to-accommodate theory of liability under the Rehabilitation Act. *See Partridge*, 2020 WL 897653, at *6 (analyzing a failure-to-accommodate theory under the Rehabilitation Act and ADA together). In addition, Plaintiff does not dispute that she must show intentional discrimination to establish liability under the Rehabilitation Act. *See* [Doc. 22 at 8–9; Doc. 25 at 6]; *see also* [*id.* at 7 ("The issue, at this stage of the litigation, is not whether the provided accommodations were reasonable, but whether the allegations, when taken as true, could show that the Defendants intentionally discriminated against the Plaintiff.")]. Thus, the relevant issue here is whether Plaintiff has plausibly alleged deliberate indifference by the staff at the Detention Facility.

In the First Amended Complaint, Ms. Mullen seeks "compensatory damages, attorneys' fees and costs and any other relief to the fullest extent by law and in an amount to be determined at trial." [Doc. 16 at ¶¶ 190, 200, 210]. To recover compensatory damages under the Rehabilitation Act, a plaintiff must establish that the discrimination at issue was intentional. *Barber ex rel. Barber v. Colorado Dept. of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (citing *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1152–53 (10th Cir. 1999)). "Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, 'intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'" *Id.* (quoting *Powers*, 184 F.3d at 1153). To establish deliberate indifference, a plaintiff must show (1) that the defendant had "knowledge that a harm

to a federally protected right [was] substantially likely, and (2) a failure to act upon that . . .

likelihood." *Barber*, 562 F.3d at 1229 (internal quotations omitted) (quoting *Duvall*, 260 F.3d at

1139); *see also Havens*, 897 F.3d at 1264; *Ulibarri v. City & Cty. of Denver*, 742 F. Supp. 2d 1192,

1212 (D. Colo. 2010).

The Adams County Defendants argue that Ms. Mullen has not adequately pled intentional

discrimination—specifically, that she has not alleged (a) discriminatory animus, or (b) that the

Adams County Defendants acted with deliberate indifference. [Doc. 22 at 12–13]. The Adams

County Defendants contend that the First Amended Complaint "is devoid of any allegations

regarding Sheriff Reigenborn's knowledge, or that of his subordinates." [*Id.* at 13]. The Adams

County Defendants further insist that "the substance of Ms. Mullen's failure to accommodate

theory [is not] an established part of her federally protected rights under the Rehabilitation Act of

which the Sheriff (or his agents) could be aware" and her allegations "assert nothing more than the

Detention Facility's failure to accommodate the specific form of her requests." [*Id.*]. For support,

the Adams County Defendants argue that the First Amended Complaint "alleges staff attempted

to communicate with [Plaintiff] both by writing and fingerspelling"; that the Detention Facility

"provided her with a video phone" and "the option of sleeping in a wheelchair rather than a cot

due to her physical limitations"; and "Ms. Mullen did not find those accommodations adequate."

[*Id.*]. The Adams County Defendants claim that the Detention Facility staff's "series of attempts

to communicate with and accommodate Ms. Mullen" constitutes "evidence of the staff's *lack* of

indifference to Ms. Mullen's circumstances." [*Id.* at 13–14 (emphasis in original) (citing *McCulley

v. Univ. of Kan. Sch. of Med.*, 591 Fed. App'x 648, 651 (10th Cir. 2014))].

In her Response, Plaintiff argues that it is improper at this stage of the litigation for the

court to consider whether the Adams County Defendants provided reasonable accommodations.

[Doc. 25 at 6]. Instead, Plaintiff contends, the relevant issue is "whether the allegations, when taken as true, could show that the Defendants intentionally discriminated against the Plaintiff." [*Id.* at 7]. Plaintiff insists that she has sufficiently pled intentional discrimination, by alleging that "Defendants" had knowledge of Plaintiff's deafness and physical handicap; that she required an ASL interpreter, wheelchair, and sleeping accommodations; and that she was "not provided reasonable accommodations based on her Deafness and physical handicap." [*Id.* at 7–8]. The court respectfully agrees with Plaintiff and finds that she has sufficiently alleged intentional discrimination to state a claim against Defendant Reigenborn at this juncture.

First, the Adams County Defendants' argument that Plaintiff "must plausibly allege [that] . . . the defendant's conduct was fueled by discriminatory animus" is improper. [Doc. 22 at 12]. Indeed, the Tenth Circuit has explained that "[t]he deliberate-indifference standard "does not require a showing of personal ill will or animosity toward the disabled person." *Havens*, 897 F.3d at 1264 (quoting *Barber*, 562 F.3d at 1228). Second, the court finds that Plaintiff has sufficiently alleged deliberate indifference by the Detention Facility staff to survive the Adams County Defendants' Motion to Dismiss. *See Gohier v. Enright*, 186 F.3d 1216, 1220–21 (10th Cir. 1999) (explaining that federal courts have addressed Title II claims arising from arrests under a theory that "while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees"); *accord A.V. through Hanson v. Douglas County Sch. Dist. RE-1*, No. 21-cv-0704-WJM-SKC, 2022 WL 504138, at *9 (D. Colo. Feb. 18, 2022) (citing to *Gohier*, and observing that "[b]ecause the same substantive standards apply to a Rehabilitation Act claim, the Court's rulings with regard to the ADA claim apply with equal force to the Rehabilitation Act

claim").  After all, Plaintiff alleges that the Detention Facility staff knew that Ms. Mullen was deaf; she required an ASL interpreter; she was unable to communicate effectively in written English or by using an interpreter who only knew how to "fingerspell" individual letters in ASL; she was physically disabled; she required an accessible bed to accommodate her physical disability; and the Detention Facility staff ignored her requests for an ASL interpreter or an accessible bed.  *See, e.g.*, [Doc. 16 at ¶¶ 124–26, 129, 133–36, 138, 151–56].

This court finds that there are sufficient allegations set forth in the First Amended Complaint to suggest that Plaintiff had an obvious need for an accommodation with respect to her hearing and amputations, and that the Detention Facility staff failed to reasonably accommodate her.  Accordingly, the court finds that the First Amended Complaint adequately pleads intentional discrimination by the Detention Facility Staff.  *But see Makeen v. Colorado*, No. 14-cv-3452-WJM-CBS, 2016 WL 8470186, at *9 (D. Colo. Sept. 16, 2016) ("Plaintiff's allegations, even taken as true, at most show that he was provided less-than-perfect accommodations, since his note takers captured significant information but less than every word, and in one case the color of the paper prevented him from reading the notes as they were being taken down, but he does not allege that he was unable to read the notes shortly thereafter.  Moreover, Plaintiff does not allege that limitation in his participation at this single hearing denied him effective access to the court overall, nor how any limitations in the effectiveness of his note takers ultimately denied him a meaningful opportunity to appear and be heard in the courts.  Plaintiff's allegations also do not show the State intentionally discriminated against him. Since the state provided the accommodations he requested, even assuming they were ultimately less than perfectly effective, Plaintiff has not sufficiently pled deliberate indifference by the State to a likely violation of his federally protected rights.").

**D.    Whether The Rehabilitation Act Imposes Liability Under a Vicarious Liability Theory**

Finally, the Adams County Defendants argue that the First Amended Complaint fails to allege "any personal or official action undertaken by Sheriff Reigenborn"; and "[t]he alleged mistreatment of, and failure to accommodate Ms. Mullen, during her incarceration are directly tied to the actions of the Detention Facility staff and deputies, or to the employees of the third-party medical provider." [Doc. 22 at 14]. The Adams County Defendants therefore insist that Plaintiff's Second Claim "proceeds on a theory of vicarious liability", which the Adams County Defendants contend the Rehabilitation Act does not allow. [*Id.* at 14–15]. In making their arguments, the Adams County Defendants rely upon the United States Supreme Court's opinion in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290 (1998), which they claim "ruled out vicarious liability under Title IX," and insist that *Gebser* "should control the analysis for the substantially similar provisions in the Rehabilitation Act." [*Id.* at 15–17].

In her Response, Plaintiff argues that vicarious liability is permitted against the Adams County Defendants under the Rehabilitation Act. *See* [Doc. 25 at 8–11]. For support, Plaintiff cites to various cases from the First, Fourth, Fifth, Seventh, and Ninth Circuits in which courts concluded that a public entity can be held liable for the acts of its employees. *See* [*id.* (citing *Duvall v. Cty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001); *Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002); *Rosen v. Montgomery Cty. Maryland*, 121 F.3d 154 (4th Cir. 1997); *Gray v. Cummings*, 917 F.3d 1 (1st Cir. 2019); and *Silk v. City of Chicago*, 194 F.3d 788, 795 (7th Cir. 1999))]. Plaintiff further argues that the Adams County Defendants' reliance on *Gebser* "is contrary to the overwhelming weight of law on point"; but, "even if the [c]ourt were to accept Defendants' argument with respect to *Gebser*, Plaintiff's claim still survives a motion to dismiss based on the Eleventh Circuit's reasoning in *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334

(11th Cir. 2012)." [*Id.* at 10].  In that case, the plaintiffs, both of whom suffered from hearing impairments, brought suit against a hospital under the Rehabilitation Act, alleging failure to communicate effectively when one of the plaintiffs sought treatment at the defendant-hospital. *Liese*, 701 F.3d at 336.  Relevant here, one of the issues before the court was "whether the actions of medical personnel, including doctors and nurses employed by [the defendant] and involved in treating the plaintiffs, can be attributed to the Hospital." *Id.*  The court held that "the actions of the Hospital's doctors may be attributed to the Hospital for purposes of establishing liability under the Rehabilitation Act." *Id.* at 336–37.  The court also noted "that several circuits have found respondeat superior liability to apply to suits brought under the Rehabilitation Act." *Id.* at 349 n.10 (collecting cases).

In their Reply, the Adams County Defendants acknowledge that "in some non-employment cases courts have . . . adopted the ADA vicarious [liability] standard", but the Adams County Defendants also claim that those courts reached their conclusions incorrectly.  [Doc. 29 at 13]. Specifically, the Adams County Defendants contend that "[t]he non-employment cases that allow for vicarious liability . . . do not consider the language of 29 U.S.C. § 794a(a)(2) or the holding in *Gesper*." [*Id.* at 14].

At this stage in the litigation, "[a]bsent any binding authority from within the Tenth Circuit, the [c]ourt will follow the guidance from the other circuit courts which have concluded that [the Rehabilitation Act] provides for" vicarious liability.  *A.V. through Hanson*, 2022 WL 504138, at *9; *see also Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) ("When a plaintiff brings a direct suit under either the Rehabilitation Act or Title II of the ADA against a municipality (including a county), the public entity is liable for the vicarious acts of its employees."); *Rosen v. Montgomery Cty.,* 121 F.3d 154, 157 n. 3 (4th Cir. 1997) ( "Under the ADA and similar statutes,

liability may be imposed on a principal for the statutory violations of its agent."); *Delano-Pyle v. Victoria Cty.,* 302 F.3d 567, 574–75 (5th Cir. 2002) ("[W]hen a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees as specifically provided by the ADA."); *DeVito v. Chicago Park Dist.,* 83 F.3d 878, 881 (7th Cir. 1996) ("[T]he ADA imposes respondeat superior liability on an employer for the acts of its agents.").

Plaintiff's allegations of intentional discrimination coupled with her theory of vicarious liability adequately nudge her Rehabilitation Act claim against Defendant Reigenborn across the line from conceivable to plausible to survive dismissal of her Second Claim. *See Robbins*, 519 F.3d at 1247. Accordingly, this court **RECOMMENDS** that the Adams County Defendants' Motion to Dismiss be **DENIED** as to Plaintiff's Second Claim against Defendant Reigenborn.[2]

## II.    Wellpath's Motion to Dismiss

Defendant Wellpath seeks dismissal of Plaintiff's Third Claim on three grounds. First, Wellpath argues that its medical services as a government contractor does not constitute a "qualifying program within the meaning of the Rehabilitation Act" because "the payments that Wellpath receives under contract for the provision of medical services is not a federal subsidy." [Doc. 23 at 1, 4 (capitalizations omitted)]. Second, Wellpath argues that Plaintiff does not sufficiently allege intentional discrimination by Wellpath solely based on her disabilities. [*Id.* at 5]. Third, Wellpath contends that it reasonably accommodated Plaintiff during her medical treatment visits. [*Id.* at 6]. The court finds Wellpath's first argument to be dispositive.

---

[2] As explained above, the court finds that the Board does not constitute a "program or activity" under the Rehabilitation Act and, therefore, Plaintiff's First Claim against the Board should be dismissed.

As mentioned above, the Rehabilitation Act prohibits any "program or activity receiving *Federal financial assistance*" from discriminating against "otherwise qualified" individuals "solely by reason of her or his disability." 29 U.S.C. § 794(a) (emphasis added). "Courts interpreting § 504 of the Rehabilitation Act have consistently construed 'Federal financial assistance' to mean the federal government's provision of a subsidy to an entity, not the federal government's compensation of an entity for services provided." *Lee v. Corrections Corp. of Am./Correctional Treatment Facility*, 61 F. Supp. 3d 139, 144 (D.D.C. 2014) (citing *Nolley v. Cty. of Erie,* 776 F. Supp. 715, 742–43 (E.D.N.Y.1991) (holding that a correctional facility receiving federal funds for detaining prisoners did not receive "Federal financial assistance" and therefore was not covered by the Rehabilitation Act); *see also DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 911 F.2d 1377, 1382 (10th Cir. 1990) ("The term 'financial assistance' is not defined in the Rehabilitation Act. We apply the ordinary meaning of the term and conclude that an entity receives financial assistance when it receives a subsidy."); *accord Squire v. United Airlines, Inc.*, 973 F. Supp. 1004, 1008 (D. Colo. 1997), *aff'd sub nom. Squire v. UAL Corp.*, 194 F.3d 1321 (10th Cir. 1999).

In the First Amended Complaint, Plaintiff alleges that Wellpath (1) "contracts with the Detention Facility to provide healthcare services at the Detention Facility"; (2) "operates and controls the medical services that it provides at the Detention Facility"; (3) "is the recipient of federal financial assistance within the meaning of Section 504"; and (4) "is required to provide reasonable accommodations to individuals with disabilities." [Doc. 16 at ¶¶ 16–19, 62, 203]. However, Plaintiff does not allege that Wellpath receives subsidies from the federal government. *See generally* [*id*]. Accordingly, the court finds that her Rehabilitation Act claim against Wellpath warrants dismissal on this basis alone. *See Lee*, 61 F. Supp. 3d at 144 (dismissing a § 504 claim

raised against a Maryland corporation operating a private prison because, although the corporation contracted with the Bureau of Prisons and the U.S. Marshals, the plaintiff did not "allege that [the corporation] receive[d] subsidies from the federal government" sufficient to qualify as "federal financial assistance" within the meaning of the statute); *accord Ndiaye v. U.S.*, No. 4:20-cv-01703, 2021 WL 4441607, at *4 (N.D. Ohio Sept. 28, 2021) (holding that, "[b]ased on *Lee* and the cases that follow it, the Rehabilitation Act" did not apply where the plaintiff alleged that a private corporation "received federal financial assistance under its agreements with ICE for the purpose of immigration detention activities" and "entered a contract with ICE to, among other things, house detainees and operate and provide medical services to detainees at the Northeast Ohio Correctional Center" as "*[t]his type of financial arrangement is not a federal subsidy, but compensation for [the corporation's] provision of services*" (emphasis added)).

In her Response, Ms. Mullen does not address her failure to allege that Wellpath receives subsidies from the federal government. Instead, she argues that "whether a defendant is a recipient of [federal financial assistance] is a question of fact that should be determined after discovery." [Doc. 30 at 3]. To this point, Plaintiff asserts that, "[t]o the extent the Court remains unconvinced that Plaintiff has pled sufficient facts demonstrating that Defendant is a recipient of [federal financial assistance], Plaintiff requests permission to conduct limited discovery under Fed. R. Civ. P. 26(a) and Fed. R. Civ. P. 34 (a-b) to address this narrow issue." [*Id.* at 3–4]. For support, Plaintiff relies upon the court's opinion in *Squire*, arguing that that opinion "seemingly acknowledged" discovery should be allowed to determine whether Wellpath is a recipient of federal financial assistance. [*Id.* at 4]. However, the court finds *Squire* inapplicable to the facts of this case. There, the court was ruling on the defendant's motion for summary judgment, and noted that the plaintiffs had "allege[d] general ways that [the defendant] receive[d] federal funds,"

but they did not "show that [the defendant] [was] subsidized by federal funds, that a program or activity for which they were excluded . . . received federal financial assistance, or that there exist[ed] other factors triggering coverage under the [Rehabilitation] Act."  973 F. Supp. at 1009. Under those facts, the court found the plaintiffs' argument seeking discovery was "sound," but dismissed the claims on other grounds.  *Id.*

Here, Plaintiff does not allege that Wellpath received any federal financial assistance apart from its contract "to provide healthcare services to the Detention Facility."  *See* [Doc. 16 at ¶¶ 16, 62].  In addition, Plaintiff argues that "[p]ublic records clearly demonstrate that Defendant is a recipient of numerous federal funds and is thus, a recipient of [federal financial assistance,]" and she references three websites to support this point.  [Doc. 30 at 3 n.1].  However, the operative document the court considers is Plaintiff's First Amended Complaint, and Plaintiff may not use her Response to the instant Motion to assert new allegations in support thereof.  *See In re Qwest Commc'ns Int'l, Inc.,* 396 F. Supp. 2d 1178, 1203 (D. Colo. 2004) (finding that a plaintiff may not further amend a Complaint by alleging new facts in response to a motion to dismiss).  Likewise, Rule 8 does not permit this court to "unlock the doors of discovery" so that Plaintiff may find support for her conclusory allegations in the First Amended Complaint that "Wellpath, LLC, contracts to provide healthcare services to the Detention Facility", *see* [Doc. 16 at ¶¶ 16, 62], or that "Wellpath, LLC, is the recipient of federal financial assistance within the meaning of Section 504", [*id.* at ¶ 18]; *see also*  [*id.* at ¶¶ 202–03].  *See Iqbal*, 556 U.S. at 678 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *accord Jensen v. Am.'s Wholesale Lender*, 425 Fed. App'x 761, 764 (10th Cir. 2011).  Accordingly, this court **RECOMMENDS** that Wellpath's Motion to Dismiss be **GRANTED** based on Plaintiff's

failure to sufficiently allege that Wellpath is a recipient of federal financial assistance under the

Rehabilitation Act.[3]

**CONCLUSION**

For the reasons stated herein, this court respectfully **RECOMMENDS** that:

(1) The Adams County Defendants' Motion to Dismiss [Doc. 22] be **GRANTED IN PART AND DENIED IN PART**;

(2) Plaintiff's First Claim against Defendant Board of County Commissioners of the County of Adams, Colorado be **DISMISSED**; and

(3) Defendant Wellpath's Motion to Dismiss [Doc. 23] be **GRANTED**.[4]

---

[3] If the presiding judge does not find that dismissal is warranted on this basis, this court would not recommend dismissal based on Wellpath's second argument that Plaintiff does not sufficiently allege intentional discrimination solely based on her disabilities, or its third argument that it reasonably accommodated Plaintiff during her medical treatment visits.  [Doc. 23 at 5].  As mentioned above, "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."  *Powers*, 184 F.3d at 1153).  And to establish deliberate indifference a plaintiff must show (1) that the defendant had "knowledge that a harm to a federally protected right [was] substantially likely, and (2) a failure to act upon that . . . likelihood."  *Barber*, 562 F.3d at 1229.

To the extent that Wellpath argues that it reasonably accommodated Plaintiff during her medical treatment visits, such an argument invites this court to engage in the weighing of facts, which it declines to do.  In the First Amended Complaint, Plaintiff alleges that she was unable to communicate effectively with Wellpath nurses, which resulted in the denial of pain medication to Plaintiff.  *See* [Doc. 16 at ¶¶ 160–64].  Such allegations are sufficient to survive a motion to dismiss.  *See Adams-Chevalier v. Spurlock*, No. 16-cv-02691-WYD-STV, 2017 WL 5665149, at *6 (D. Colo. Sept. 25, 2017) (denying a motion to dismiss on the basis that "requesting an interpreter right away would have been the fastest way to both ensure [the plaintiff's] safety and ensure that the deaf family members received effective communication"); *Rogers v. Colorado Dep't of Corrections*, No. 16-cv-02733-STV, 2019 WL 1558081, at *3 (D. Colo. Apr. 9, 2019) ("Ultimately, for purposes of deciding the instant Motion to Dismiss, the Court need not decide whether CDOC must provide Plaintiffs with a videophone in order to provide a reasonable accommodation, because Plaintiffs have plausibly alleged that they have often been denied *any* meaningful access to forms of communication with friends and family.").

[4] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection

DATED:  April 28, 2022                    BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge

---

for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Prop. Known As 2121 E. 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).