**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-02398-CNS-MDB

CYNTHIA MULLEN,

      Plaintiff,

v.

GENE CLAPS, in his official capacity as the Sheriff of the County of Adams,

      Defendant.

_____

**SHERIFF GENE CLAPS' MOTION FOR SUMMARY JUDGMENT**

_____

## INTRODUCTION

In August 2020, during the height of the COVID-19 pandemic, Ms. Cynthia Mullen, who is deaf, diabetic, and an amputee, was arrested by Brighton city police for a fight that occurred in car in which Ms. Mullen was a passenger. According to Ms. Mullen, Brighton police interrogated her without arranging for an ASL interpreter, determined she was the aggressor, and charged her with domestic violence. Close to midnight, Ms. Mullen was transported by Brighton police to the Adams County detention facility to be held overnight until her court appearance the following morning. While there, she was searched, changed into prison clothes, shown an orientation video, and housed in the medical unit where she had access to medical services provided by WellPath. Before being transferred to the medical unit, the booking sergeant on duty assessed Ms. Mullen's need for an ASL interpreter and requested one in accordance with the policies then in effect at the jail. Despite this, the booking sergeant's phone call to the designated deputy–who was fully proficient in ASL–was not returned that evening. At the time of Ms. Mullen's court appearance the next morning, however, Ms. Mullen was provided an ASL interpreter. She posted a bond and was released just before noon on August 25, 2020. The charges against Ms. Mullen were eventually dropped upon her completion of an anger management course.

Ms. Mullen now sues the current Adams County Sheriff, Gene Claps, under Section 504 of the Rehabilitation Act, for the failure to provide her an ASL interpreter for the roughly 10 hours prior to her court appearance. The undisputed facts, however, establish that Ms. Mullen is not entitled to relief against Sheriff Claps under the legal standards applicable in non-employment cases under the Rehabilitation Act. The Court should, therefore, grant summary judgment in favor of Sheriff Claps pursuant to Fed. R. Civ. P. 56(a).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.     The Defendant, the Adams County Sheriff Gene Claps**:

1.     Ms. Mullen sued the Adams County Sheriff in his "official capacity." (ECF 16, Am. Comp. at ¶¶ 12-14; ECF 74, Unopposed Mot. for Sub. of Party at 1-2.)

2.     On August 24 to August 25, 2020, at the time of the events that are alleged to have occurred, the Adams County Sheriff was Richard A. Reigenborn. (ECF 16, Am. Comp. at 3, ¶ 12 & 6, ¶ 51; ECF 61, Ans. at 2, ¶ 12 & 5, ¶ 51.)

3.     The current elected Adams County Sheriff is Gene Claps who took office in January 2023. (ECF 74 at 1-2.)

4.     The Adams County Sheriff "is a Colorado State department/agency" for purposes of the operating and controlling the Adams County Detention Facility (ECF 16, Am. Comp. at 6, ¶ 52; ECF 61, Ans. at 6, ¶ 52; Ex. A at 4, UDF No. 12; Ex. B, Tr. at 10:7-10; 224:5-9.)

5.     The Adams County Sheriff is responsible for operating and implementing policies for the Adams County Detention Facility, including the provision of accessibility appliances. (Ex. A at 4, UDF Nos. 13 & 14.)

6.     The Adams County Sheriff receives funding from the federal, state, and county governments, and raises funds through fee-based services and contracts. (Ex. B, Tr. at 18:5-23.)

**II.    The Adams County Detention Facility**:

7.     In 2020, the Adams County Sheriff received federal funds that were earmarked for the operation of the Adams County detention facility. (ECF 16, at 3, ¶ 13; ECF 61, at 2, ¶ 13.)

8.     The Sheriff authorizes policies and post orders regarding the detention facility. (Ex. Y, Jungclaus Aff. at ¶ 4; Ex. B, Tr. at 153:5-20.)

9.      In 2011, the then-Adams County Sheriff, Douglas Darr, was sued in federal court under the ADA and Section 504 of the Rehabilitation Act relating to the Adams County Detention Facility's use of ASL translators. *See Siaki v. Darr*, No. 11-cv-03074-JLK, 2012 U.S. Dist. LEXIS 139274 *2 (D. Colo. Sept. 27, 2012). (*See also* Ex C.)

10.     In 2012, the parties to the litigation settled and entered into a procedure that was adopted by the Court and subject to court supervision for two years. (*Id.* at *6-7, § 4; *12, § 6.4.)

11.     In response to the settlement agreement, the then-Sheriff revised Post Order 109.1. (*Id.* at *7, § 4.1; *see also* Ex. Y, T. Jungclaus Aff. at ¶ 5.)

12.     In August 2020, a version of Post Order 109.1 (created in April 2012 and last updated July 2014) regarding the receiving and booking of inmates with disabilities was still in effect. (Ex. D; Ex. Y, T. Jungclaus Aff. at ¶ 6; Ex. B, Tr. at 121:23-19.)

13.     Among other things, Post Order 109.1 requires the booking officer to assess an inmate's need and desire for a sign language interpreter using two forms attached to the post order as exhibits A and B and derived from the *Siaki* order. (*Id.* at 1, § 1.a.iii & Exs. A & B, thereto).

14.     If the inmate requests a sign language interpreter on the booking form, the booking officer is to request an interpreter using the approved list for ASL interpreters. (*Id.* at 2, § 3.)

15.     In August 2020, the approved list for sign language interpreters then in effect listed two Sheriff's employees as ASL interpreters. (Ex. E at 1; Ex. Y, Jungclaus Aff. at ¶ 7.)

16.     One of those two employees was Deputy Kristofer Runge. (Ex. E at 1.)

17.     Deputy Runge was the deputy who worked the evening shift and was essential personnel during COVID and subject to call-outs. (Ex. B, Tr. at 125:15-126:16.)

18.     In August 2020, a version of Adams County Sheriff Post Order 109.1.2 (last updated August 21, 2017) regarding the use of the Sorenson Video Relay Service (SVRS) was in effect. (Ex. F; Ex. Y, Jungclaus Aff. at ¶ 8.)

19.     Among other things, that version of Post Order 109.1.2 provided that inmates could use the SVRS once a day for 30 minutes, although deputies had the unwritten discretion to allow inmates to use the phone more if circumstances permitted. (Ex. F at 1; Ex. B, Tr. at 184:24-185:12.)

20.     In August 2020, a version of Adams County Sheriff Policy 331 (last updated on July 14, 2018) regarding communications with hearing impaired or disabled inmates was also in effect. (Ex. G; Ex. Y, Jungclaus Aff. at ¶ 9.)

21.     In part, Policy 331 prohibits discrimination against individuals with disabilities and sets the policy of the Sheriff's office to reasonably accommodate them. (Ex. G at § 331.2.)

## III.    The Plaintiff, Ms. Cynthia Mullen

22.     Ms. Mullen has diabetes, high blood pressure, and an amputated leg. (Ex. H; Tr. at 13:22-14:4.)

23.     Ms. Mullen is also deaf. (*Mullen v. S. Denver Rehab., LLC*, No. 18-cv-01552-MEH, 2020 WL 2557501, *2-3, ¶1 (D. Colo. May 20, 2020);[1] Ex. H; Tr. at 3:16-17.)

24.     "She can sometimes read lips." (*Mullen*, 2020 WL 2557501 at 2, ¶1.)

---

[1] Undisputed facts 23-34 are drawn in part from the findings of fact at summary judgment in *Mullen v. S. Denver Rehab., LLC*. These facts qualify for collateral estoppel or issue preclusion as final findings relevant to the entry of judgment. *See Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 506-07 (Colo. App. 2009). For confirmation, the deposition transcript supporting the Court's summary judgment ruling in *S. Denver Rehab* is attached hereto as Exhibit I pursuant to Fed. R. Civ. P. 32(a)(8) and *Coldwell v. RiteCorp Envtl. Prop. Sols.*, 2018 U.S. Dist. LEXIS 178504, *23-25 (D. Colo. Oct. 17, 2018). Where deposition citations to Exhibit H are also provided, Ms. Mullen similarly testified in her deposition in this case.

25.     "[Ms.] Mullen's primary means, and preferred mode, of communication is American Sign Language ('ASL')." (*Mullen*, 2020 WL 2557501 at 2, ¶2; Ex. H, Tr. at 3:21-23.)

26.     Ms. Mullen can read some words in written English. (Ex. J at 18, Resp. RFA 1.)

27.     She learned ASL and reading in elementary and middle school, along with typing in high school. (*See Mullen*, 2020 WL 2557501 at 2, ¶¶2 & 3; Ex. H, Tr. at 14:19-15:19.)

28.     "[Ms.] Mullen reads and handles her own mail, and reviews, disputes, and pays her own bills, including medical bills." (*Mullen*, 2020 WL 2557501 at 3, ¶6.)

29.     Ms. Mullen can read and sign agreements and papers without an interpreter. (Ex. H, Tr. at 20:7-16.)

30.     "She has also leased apartments–in which she has lived on her own–and read, understood, and signed the leases." (*Mullen*, 2020 WL 2557501 at 3, ¶6; Ex. H, Tr. at 19:21-20:16.)

31.     "[Ms.] Mullen has taught ASL to hearing persons by writing a word, then showing the person the sign for that word, and by using a 'basic book of signs.'" (*Mullen*, 2020 WL 2557501 at 3, ¶7; Ex. H, Tr. at 18:3-18:17.)

32.     "[Ms.] Mullen enjoys watching television and movies with closed captioning, coloring in coloring books, chatting on Facebook, and reviewing dating websites." (*Mullen*, 2020 WL 2557501 at 3, ¶8; Ex. H, Tr. at 20:17-21:7.)

33.     Ms. Mullen texts in English and reads social media posts without an interpreter. (Ex. H, Tr. at 19:5-9; 20:25-21:7.)

34.     "[Ms. Deborah] Johnson is [Ms.] Mullen's caregiver," and when they are not together, they "communicate through texts." (*Mullen*, 2020 WL 2557501 at 4, ¶15 & 5, ¶18.)

35.     Ms. Mullen has not been employed since at least 2015. (Ex. J at 4, Resp. ROG 5.)

**C.**     **The Events of August 24 to August 25, 2020**:

36.     Ms. Mullen was arrested by the Brighton Police on August 24, 2020, arising out of an altercation in a car while it was in Brighton, Colorado. (Ex. K.)

37.     Ms. Mullen was in the car with Ms. Johnson and Ms. Susan Weiler. (*Id.*)

38.     Ms. Mullen provided a written statement to the Brighton police without the aid of an ASL translator. (Ex. L.)

39.     Brighton Police charged Ms. Mullen with domestic violence and assault in the third degree under Colo. Rev. Stat. §§ 18-6-800.3 and 18-3-204(1)(a). (Ex. K.)

40.     Ms. Mullen arrived at the Adams County Detention Facility on August 24, 2020, at 11:48 p.m. (Ex. A at 3, UDF No. 2; Ex. M, Tr. at 123:17-124:12.)

41.     Brighton Police indicated to detention facility staff that Ms. Mullen was "hearing impaired." (Ex. Z, Stein Aff. at ¶ 8.)

42.     After intake, deputies at the detention facility transported Ms. Mullen using a wheelchair. (Ex. M, Tr. at 41:24-43:6; Ex. Z, Stein Aff. at ¶ 9.)

43.     Sheriff's Deputy Kraefft assisted Ms. Mullen in changing from her civilian clothing to jail clothing. (Ex. H, Tr. at 72:2-73:14; Ex. M, Tr. at 95:3-96:6.)

44.     Ms. Mullen was transported to the booking desk and shown an orientation video that used an ASL translator.[2] (Ex. M, Tr. at 41: 24-45:18; Ex. Z, Stein Aff. at ¶¶ 10-13.)

---

[2] In her discovery responses, Ms. Mullen admitted "she was shown an orientation video, however, Plaintiff lacks knowledge and information about whether the video was for the 'hearing impaired.'" Ex. K at 18, Resp. to RFA 3. In the stipulated facts, she also admitted an "officer played an ASL movie for Ms. Mullen about what to do as an inmate when transferred to a jail cell." Ex. A at 4, UDF No. 20. In her deposition, Mr. Mullen initially testified she was not shown an ASL orientation video. Ex. H, Tr. at 57:18-58:4. She then admitted, however, a video was played and that she "assumed" the video was not ASL because the person shown was "moving their mouth." *Id.* at 58:5-11. A copy of the video is conventionally submitted

45.     Booking officer Jeffrey Stein communicated with Ms. Mullen in writing using the exhibit to Post Order 101.1 (Ex. Z, Stein Aff. at ¶ 14; Ex. O.)

46.     In response, Ms. Mullen requested an ASL interpreter. (*Id.*)

47.     Pursuant to the then protocol, Deputy Stein attempted to call Deputy to come to the jail and provide ASL interpretation for Ms. Mullen. (Ex. Z, Stein Aff. at ¶ 15.)

48.     Deputy Rungee did not answer Deputy Stein's phone call and Deputy Stein left a message. (*Id.* at ¶ 15.)

49.     Deputy Rungee did not return the phone call that evening. (*Id.* at ¶ 25)

50.     Deputy Stein continued to communicate with Ms. Mullen in writing. (Ex. Z, Stein Aff. at ¶ 18; Ex. O at 1-2.)

51.     Ms. Mullen completed her intake paperwork in writing. (Ex. H, Tr. at 75:10-76:14; 95:11-18; Ex. Z, Stein Aff. at ¶17; Exs. P & Q.)

52.     Ms. Mullen was provided access to a Sorenson video phone, which she attempted to use one time. (Ex. H, Tr. at 76:15-19; Ex. Z, Stein Aff. at ¶24; Ex. A at 4, UDF No. 22 & 22.)

53.     Ms. Mullen was transferred to the medical unit for the duration of her overnight incarceration by Deputy Kraefft. (Ex. Z, Stein Aff. at ¶ 21.)

54.     Deputy Kraefft communicated in writing with Ms. Mullen, although her written notes were not kept. (Ex. M, Tr. at 89:7-94:7.)

55.     The medical unit has handicap accessible restrooms and cots and was staffed by nurses from WellPath, Inc. (Ex. B, Tr. at 115:4-116:6; 165:13-166:3; 259:21-260:19; Ex. M, Tr. at 72:3-18; 100:24-102:1; Ex. A at 3, UDF No. 24.)

---

as Exhibit N, wherein the ASL translator both signs and mouths along to the video's narration.

56.     Deputy Stein sent an email to the "Jail Recap Group" regarding arrangements for Ms. Mullen to receive an ASL translator at her court appearance and filled out her court appearance record. (Ex. Z, Stein Aff. at ¶¶ 22 & 25; Ex. R & S.)

57.     Ms. Mullen appeared before the Adams County District Court by video from the detention center on August 25, 2020 between 8:30 and 10:00 a.m. (Ex. H, Tr. at 74:18-25; Ex. T.)

58.     Ms. Mullen communicated with court services in writing prior to her court appearance and filled out her bond application. (Ex. H, Tr. at 94:6-95:10; Exs. U at 2 & V.)

59.     Ms. Mullen was provided an ASL interpreter at her appearance before the Adams County District Court on August 25, 2020. (Ex. H, Tr. at 88:3-25.)

60.     Ms. Mullen left the Adams County Detention Facility on August 25, 2020 at 12:19 p.m. (Ex. J at 20-21, RFA No. 10.)

61.     During her period of incarceration, Ms. Mullen did not interact with then-Sheriff Reigenborn. (Ex. H, Tr. at 12:7-9)

62.     Ms. Mullen has not met the current Sheriff Gene Claps. (Ex. H, Tr. at 11:18-25.)

63.     The charges against Ms. Mullen were eventually dropped upon her completion of an anger management course. (Ex. W; Ex. H, Tr. at 101:12-18.)

## IV.   **Other Material Facts**:

64.     Ms. Mullen did not incur any economic damages as a result of her overnight incarceration at the Adams County detention facility. (Ex. H, Tr. at 104:16-23.)

65.     Ms. Mullen did not incur any medical injuries or expenses as a result of her overnight incarceration at the Adams County detention facility. (Ex. H, Tr. at 104:20-105:14.)

66.     In 2021, Post Order 109.1.2 was revised to increase the time allowed for SVRS calls from 30 to 45 minutes, as well as to make explicit that an inmate may make more than one call per day when circumstances allow. (Ex. X; Ex. B, Tr. at 181:12-182:8; 185:24-186:12.)

67.     In late 2022, the Sheriff changed the ASL translation protocol from using deputies to using an on-call translation service, A & A Languages LLC. (Ex. B, Tr. at 227:23-228:17.)

## LEGAL STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Clemmons v. Bohannon*, 956 F.2d 1523, 1525 (10th Cir. 1992) (quoting Fed. R. Civ. P. 56(c)). An issue is "material" only when the controversy is over facts that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the mere existence of some alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

## ARGUMENT

Ms. Mullen's sole remaining claim is against Sheriff Claps in his official capacity under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The elements of a claim under § 504 are whether: "(1) plaintiff is handicapped under the Act; (2) [she] is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against [her]." *Hollenbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008), *citing Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1151 (10th Cir. 1999). Here, Ms. Mullen has failed to adduce sufficient evidence in support of a legally cognizable claim against

Sheriff Claps under the fourth element of a claim arising under the Rehabilitation Act. Even if she had, her claim is now moot. And Sheriff Claps in his official capacity is also entitled to Eleventh Amendment immunity in his statutory role as the keeper of the jail.

## I.   MS. MULLEN WAS NOT DENIED MEANINGFUL ACCESS TO THE ACTIVITIES OF THE ADAMS COUNTY DETENTION FACILITY.

The fourth element of a Rehabilitation Act claim itself consists of two prongs: (1) did discrimination occur; and, if so, (2) was its intentional? *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1265 (10th Cir. 2018). As to the first prong, "[t]he Supreme Court has recognized that § 504 is intended to ensure that 'an otherwise qualified handicapped individual [is] provided with meaningful access to the benefit that the grantee offers . . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit *may* have to be made.'" *Barber*, 562 F.3d at 1229 (alterations in original, emphasis added), *quoting Alexander v. Choate*, 469 U.S. 287, 301 (1985). "The Act does not, however, guarantee the handicapped equal results" from participation in such programs and services. *Alexander*, 469 U.S. at 304 (citation omitted); *see also Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 146 (1st Cir. 2014). The plaintiff bears the burden of establishing that the defendant "discriminated against the handicapped" in the offered program or service by failing to provide meaningful access to the program and service, "such that the need for a remedial interactive process aimed at finding a reasonable accommodation was triggered." *Barber*, 562 F.3d at 1233 (Gorsuch, J., concurring).

The standard for discrimination claims under the Rehabilitation Act in non-employment cases come from Title VI of the Civil Rights Act, not the ADA. The text of the Rehabilitation Act itself sets forth the "[s]tandards used in determining [a] violation" of Section 504 as follows:

The standards used to determine whether this section has been violated in a

> complaint *alleging employment discrimination* under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), *as such sections relate to employment*.

29 U.S.C. § 794(d) (emphasis added); *see Flynn*, 812 F.3d at 426 (Section 794(d) "incorporated *portions of the ADA* by reference") (emphasis added). The Rehabilitation Act further provides:

> The remedies, procedures, and *rights* set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 504 of this Act [29 USCS § 794].

*Id.* at § 794a(a)(2) (emphasis added). Thus, in non-employment cases, such as this one, the Rehabilitation Act states that Title VI provides the governing legal standards—*not the ADA, nor the DOJ's regulations interpreting the ADA. See Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 421 (4th Cir. 2015) ("Congress expressly cross-referenced Title I, but not Title II, when mandating the standards that apply to *employment discrimination* claims brought under Section 504 of the Rehabilitation Act.") (emphasis added); *Tyler v. City of Manhattan*, 118 F.3d 1400, 1412 (10th Cir. 1997) ("*Where employment discrimination is at issue*, both the Rehabilitation Act and the ADA have been read to incorporate Title VII remedies, not Title VI remedies.") (emphasis added).[3]

Here, Ms. Mullen was not denied access to the services of the jail or discriminated against

---

[3] *See also Alexander*, 469 U.S.at 293 n.7 (1985) (warning that "too facile an assimilation of Title VI law to § 504 must be resisted."); *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1312-1313 (10th Cir. 2021) (Rehabilitation Act has a different causation standard than ADA); *Schrader v. Fred A. Ray, M.D., P.C.*, 296 F.3d 968, 969-75 (10th Cir. 2022) (Rehabilitation Act does not incorporate ADA's 15-employee requirement); *Flynn v. Distinctive Home Care, Inc.*, 812 F.3d 422, 428 (5th Cir. 2016) (agreeing with the Ninth and Tenth Circuits that "the Rehabilitation Act does not completely incorporate the terms of the ADA"); *K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013) ("[T]he connection between Title II and Section 504 is nuanced. Although the general anti-discrimination mandates in the two statutes are worded similarly, there are material differences between the statutes as a whole.").

during her incarceration. She was booked into the jail, provided a private medical cell, provided access to healthcare, was scheduled for the earliest available court appearance, was provided a translator for that appearance, bonded out, and was released from the detention facility within 12 hours. She complains of no physical injuries or economic damages. She did not request nor was she denied access to any of the elective programs or activities provided by the detention facility during her short 12 hour stay. The only thing Ms. Mullen can point to is that the detention facility's procedure for communications with deaf inmates was unsuccessful in providing her the ASL translator she requested as an accommodation because the translator did not return the booking sergeant's phone call. But a failure in implementing a policy to provide an ASL interpreter during the booking process is not tantamount to a violation of the Rehabilitation Act. In *Southeastern Community College v. Davis*, 442 U.S. 397 (1979), the Supreme Court held that ordinarily the Rehabilitation Act does not require a covered entity to engage in "affirmative action"—*i.e.*, an accommodation—as a matter of course. *Id.* at 410-11. Because the failure to provide an interpreter did not meaningfully impede her incarceration (or release therefrom), Ms. Mullen has not established discrimination under a Title VI standard. *See Cropp v. Larimer County*, 941 F.3d 1237, *18 (10th Cir. 2019) (unpublished) (holding "the County's mere failure to provide [plaintiff] with the precise auxiliary aid he requested" does not "necessarily amount[] to discrimination—let alone intentional discrimination via deliberate indifference").[4]

---

[4] *See also Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012) ("failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights"); *Petersen v. Hastings Pub. Sch.*, 31 F.3d 705, 708-09 (8th Cir. 1994) (rejecting argument that school district violated Title II by refusing to "utilize the signing system" of plaintiffs' choice).

Instead Ms. Mullen asserts that discrimination occurred in the effectiveness of the deputies' communications with her during her incarceration. (Ex J, at 18-20.) This standard is derived from Department of Justice regulations promulgated to implement the nondiscrimination mandate of *Title II of the ADA*. *See* 42 U.S.C. § 12134(a) (requiring the Attorney General to promulgate regulations to implement Title II).[5] Under Title II, DOJ issued a regulation that a subject public entity "shall take appropriate steps to ensure that communications with . . . participants . . . with disabilities are as effective as communications with others." 28 C.F.R. § 35.160. When Title II is applicable and a party sues a detention facility, the issue is whether a party complies with the corresponding regulations. *See*, *e.g.*, *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1195-99 (10th Cir. 2007). But that is not this case. Ms. Mullen has asserted *no claim* under Title II of the ADA.[6] Thus, DOJ's regulations are simply inapplicable. *Accord Hamer v. City of Trinidad*, 441 F. Supp. 3d 1155, 1171-72 (D. Colo. 2020) (declining to consider DOJ regulations when evaluating Rehabilitation Act claim). Simply put, DOJ does not have statutory authority to pass regulations implementing the Rehabilitation Act.

---

[5] When applicable, DOJ's regulations interpreting Title II are entitled to substantial deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). *See Marcus v. Kan. Dept. of Revenue*, 170 F.3d 1305, 1307 n.1 (10th Cir. 1999). In *Loper Bright Enterprises v. Raimondo*, No. 22-451, the Supreme Court has recently granted certiorari to consider whether to overrule *Chevron*.

[6] Nor is it clear she could have. The construction of the Adams County Detention Facility predates the effective date of the ADA, such that if a requested accommodation required physical modification of the facilities, it would fall outside of the duties imposed by the ADA. 42 U.S.C. § 12182(b)(2)(A)(iv). In any event, the statute of limitations ran on any potential ADA claim on August 25, 2022. *See Hamer v. City of Trinidad*, 441 F. Supp. 3d 1155, 1174 (D. Colo. 2020) (two-year statute of limitations).

## II. NEITHER SHERIFF CLAPS NOR HIS PREDECESSOR NOR THE ON-DUTY DEPUTIES INTENTIONALLY DISCRIMINATED AGAINST MS. MULLEN OR WERE DELIBERATELY INDIFFERENT TO HER DISABILITIES.

"To recover compensatory damages under § 504 [of the Rehabilitation Act], a plaintiff must establish that the agency's discrimination was intentional." *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009). "[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers*, 184 F.3d at 1153. Deliberate indifference requires both "(1) that the defendant had knowledge that a harm to a federally protected right was substantially likely, and (2) a failure to act upon that likelihood." *Havens*, 897 F.3d at 1264 (cleaned up). Moreover, the Rehabilitation Act, unlike the ADA, requires the plaintiff's disability be the sole cause of the discrimination, not just a but-for cause. *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1312-13 (10th Cir. 2021).

Even if Ms. Mullen was denied meaningful access to the programs and activities of the Adams County Detention Facility, the failure to adequately accommodate her disabilities was due solely to the failure of a single off-duty deputy to return a phone around midnight during Ms. Mullen's incarceration. But the only named defendant in this case is the current Adams County Sheriff. Here, neither the current Adams County Sheriff nor the former Adams County Sheriff ever interacted with Ms. Mullen during her incarceration. To the best of her knowledge, she has never met them. There is no evidence the former Sheriff knew Ms. Mullen was disabled or used ASL as her primary means of communication, or even knew she was in the detention facility until after she had departed. The only notification of her presence to the management level of the Sheriff department came by email after she had left the facility. Nor is there any evidence the current or

former Sheriff was aware of Ms. Mullen's request to have an ASL interpreter or that one had not been provided to her at booking. Rather, the former Sheriff had written policies in place to provide accommodations to both the deaf and disabled that, at worst, while followed did not result in an ASL interpreter to be provided to Ms. Mullen within the first 10 hours of her incarceration. Ms. Mullen, however, has provided no evidence that either then-Sheriff Reigenborn or now-Sheriff Claps had knowledge that a harm to a federally protected right was substantially likely when Ms. Mullen arrived at the detention facility. In short, there is no evidence that either the current or former Adams County Sheriff intentionally discriminated against Ms. Mullen.

As for the deputies, their conduct on the night of Ms. Mullen's incarceration does not rise even to the level of negligence. They repeatedly attempted (and succeeded) in processing Ms. Mullen as expeditiously as possible, provided her a private cell in the medical unit, and arranged for her to appear at the earliest available court hearing with an ASL interpreter present. Even if their conduct somehow did rise to the level of negligence, it was not deliberate as is required to establish intentional discrimination. *Havens*, 897 F.3d at 1264. "[B]ureaucratic slippage," simple "mistakes," or negligent failures to accommodate do not rise to the level of deliberate indifference. *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (deliberate indifference does not "occur when a duty to act may simply have been overlooked"), *Ferguson v. City of Phoenix*, 157 F.3d 668, 675 (9th Cir. 1998) (holding that "not uncommon bureaucratic inertia" coupled with "some lack of knowledge and understanding" about regulatory requirements, did not amount to deliberate indifference). Again, there is no evidence anyone at the Adams County detention facility was deliberately indifferent to Ms. Mullen's disabilities or that Ms. Mullen's disability was the sole cause of any deliberate indifference or discrimination.

III.   **THE SHERIFF IS NOT LIABLE FOR THE ACTS OR OMISSIONS OF THE DETENTION FACILITY STAFF BECAUSE THE REHABILITATION ACT DOES NOT CREATE RESPONDEAT SUPERIOR LIABILITY.**

The only remaining defendant in this case is Sheriff Claps. In her complaint, Ms. Mullen casts the cause of her treatment as being "[t]he Sheriff's actions," (*id.* at ¶ 197). But the evidence in this case reveals no personal or official action undertaken by either Sheriff Claps or his predecessor Sheriff Reigenborn as to Ms. Mullen specifically. At the time of the incident, Sheriff Claps was neither the Sheriff nor a deputy with the Sheriff's office. Ms. Mullen has not established that former sheriff Reigenborn was on duty at the detention facility the night of her arrest or was even aware that she was incarcerated there until after her release.

Rather, the alleged failure to accommodate Ms. Mullen during her incarceration are directly tied to the actions of the Detention Facility staff and deputies, or to the employees of the third-party medical provider (*see* ECF 16, ¶¶ 191, 197-198) who, at worst, were unable to provide an ASL interpreter pursuant to the policy then in place due to the designated interpreter not answering his phone. Ms. Mullen's second claim for relief simply imputes those actions to the Sheriff–then Reigenborn, now Claps–in a conclusory manner. Sheriff Reigenborn is not alleged to have participated in those actions or to have even been aware them. In other words, Ms. Mullen's second claim for relief proceeds on a theory of vicarious liability.

As the Supreme Court has recently advised, courts and litigants should not simply presume all anti-discrimination statutes operate the same way, especially with regards to vicarious liability. As recently as 2015, in *City & County of San Francisco v. Sheehan*, the Supreme Court dismissed certiorari as improvidently granted on the issue of whether Title II of the ADA allows for vicarious liability against public entities. 575 U.S. 600, 610 (2015). It did so despite the agreement of the

parties that it did and despite precedent in the circuit court of appeals allowing for such claims. *Id.*; *cf. Duvall*, 260 F.3d at 1141 (9th Cir. 2001).

With the respect to vicarious liability under the Rehabilitation Act, the Tenth Circuit does not appear to have addressed this issue. *See Amparo & Robert Mata v. Bd. of Educ. of Las Cruces Pub. Schs*, No. 12-CV-00136 MCA/SMV, 2013 U.S. Dist. LEXIS 207141, *8-9 (D.N.M. May 21, 2013). Several circuits have allowed vicarious liability as a theory for Rehabilitation Act claims. *See Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574-75 (5th Cir. 2002) (allowing for vicarious liability); *Duvall*, 260 F.3d at 1141 (9th Cir. 2001) (same); *Rosen v. Montgomery Cnty. Md.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997) (same). Respectfully, however, those circuits have not adequately addressed the impact of the Supreme Court's decision in *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 290 (1998), which ruled out vicarious liability under Title IX.

As relevant here, Title IX provides in pertinent part that a person cannot "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a); language that is nearly identical to that of the Rehabilitation Act. *Compare* 29 U.S.C. § 794. In *Gebser*, the Supreme Court held that a school district could not be held liable under Title IX of the Education Amendments of 1972 "unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [district]'s behalf has *actual knowledge* of discrimination." 524 U.S. 274, 290 (1998) (emphasis added). The Court based its analysis on the fact that Title IX (unlike Title VII) does *not* contain an express cause of action. *Id.* at 283-84. The Court reasoned that the implied cause of action available under Title IX was limited to only direct liability because of the contractual nature of Title IX–*i.e.*, that in exchange for federal funds,

the recipient agrees not to discriminate on an impermissible basis, but not to be liable for the acts of its employees. *Id.* at 285-86. This interpretation was consistent, the Court held, with the statute's express enforcement mechanism that requires notice of a violation to the "appropriate person" and the potential for voluntary compliance before administrative enforcement proceedings can commence. *Id.* at 288-89. In so holding, *Gebser* insulated public entities from liability under Title IX on a theory of vicarious liability. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642-43 (1999) ("The high standard imposed in *Gebser* sought to eliminate any 'risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions.'"), *quoting Gebser*, 524 U.S. at 290-291.

In addition to incorporating (albeit in different classes of cases) the discrimination standards under the ADA, 42 U.S.C. § 12131 *et seq.*, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq., the Rehabilitation Act was also modeled on Title IX of the Education Amendments of 1972. *See Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1378 (10th Cir. 1981) (quoting S.Rep.No. 93-1297, 93 Cong. 2d Sess. 39-40, reprinted in 4 U.S.Code Cong. and Admin. News, pp. 6373, 6391 (1974)). Cases construing Title IX, therefore, provide meaningful precedent as to how courts should construe the related portions of the Rehabilitation Act. *See Pushkin*, 658 F.2d at 1379-80 (holding the Rehabilitation Act has an implied right of action based on Title IX precedent), applying *Cannon v. University of Chicago*, 441 U.S. 677 (1979).

*Gebser*'s ruling under Title IX should control the analysis for the substantially similar provisions in the Rehabilitation Act. *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348-49 & n. 10 (11th Cir. 2012) (applying deliberate indifference standard under Section 504 of Rehabilitation Act in light of *Gebser*). The Rehabilitation Act contains nearly identical operative

language to Title IX. *Compare* 20 U.S.C. § 1681(a) and 29 U.S.C. § 794. The Rehabilitation Act lacks an express cause of action as does Title IX. *See Pushkin*, 658 F.2d at 1379-80 (Rehabilitation Act has an implied cause of action); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 284-85 (2d Cir. 2003) (same through its incorporation of Title VI). The Rehabilitation Act is Spending Clause legislation that is "contractual" in nature in the same way as Title IX. *See Barnes v. Gorman*, 536 U.S. 181, 186-87, 189 & n.3 (2002). The Rehabilitation Act contains the same enforcement mechanism requiring notice and an opportunity to voluntarily cure (through its incorporation of Title VI, *see* 42 U.S.C. § 2000d-1) as Title IX. *See United States v. Florida*, 938 F.3d 1221, 1250 (11th Cir. 2019); *see also Henrietta D*, 331 F.3d at 284-85.

In short, after *Gebser*, the Rehabilitation Act should not be construed to allow vicarious liability. At least one district court within the Tenth Circuit now agrees. *See Gradeless v. Kan. State Univ.*, 2023 U.S. Dist. LEXIS 44703, *12-14 (D. Kan. Mar. 16, 2023). Vicarious liability, moreover, is inconsistent with a deliberate indifference or intentional discrimination standard. *See Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1290 (10th Cir. 2017). The Adams County Sheriff is liable only for his own actions under the Rehabilitation Act. There is no evidence either Sheriff Claps or former Sheriff Reigenborn personally acted or failed to act in any way that violated Ms. Mullen's rights under the Rehabilitation Act as required for such a claim. *Cf. Iqbal*, 556 U.S. at 676. As such, Sheriff Claps is entitled to summary judgment.

## IV. MS. MULLEN HAS NOT ESTABLISHED AN ENTITLEMENT TO EITHER ECONOMIC DAMAGES OR INJUNCTIVE RELIEF.

Under Fed. R. Civ. P. 56(c), a party may seek summary judgment on the issue of damages. Where a plaintiff fails to put forth any evidence that she suffered actual damages, it is reversible

error not to grant the defendant summary judgment on that issue. *Fox v. TransAm Leasing, Inc.*, 839 F.3d 1209, 1218-20 (10th Cir. 2016).

In her prayer for relief in the first amended complaint, Ms. Mullen generally seeks "damages, and injunctive relief[.]" ECF No. 16 at 23. The body of her complaint contains no reference to injunctive relief. The complaint does indicate, however, that Ms. Mullen seeks from the Sheriff "compensatory damages, attorneys' fees and costs and any other relief to the fullest extent permitted by law and in an amount to be determined at trial." *Id.* at 21, ¶ 200; *see also id.* at ¶ 198 ("Ms. Mullen has suffered damages, both real and intangible, including, but not limited to, pain and suffering, humiliation, inconvenience, physical injury, and emotional distress.").

Emotional distress damages are not available for private discrimination claims under the Rehabilitation Act. *Cummings v. Premier Rehab Keller PLLC*, 142 S. Ct. 1562, 1576 (2022). Moreover, punitive damages are not available for private claims under the Rehabilitation Act. *Barnes v. Gorman*, 536 U.S. 181 (2002). Where applicable, only economic damages and injunctive relief are available under the Rehabilitation Act. Ms. Mullen is entitled to neither. She has not suffered any economic damages and her request for equitable relief is moot. Because she has nothing to recover, the Court should grant summary judgment to Sheriff Claps. *See Hacker v. Dart*, No. 21-2910, 2023 WL 2531505, *25-26 (7th Cir. Mar. 16, 2023).

### A.  Ms. Mullen Has Not Established She Suffered Any Economic Damages.

Despite repeated inquiries, Ms. Mullen has not disclosed a damages calculation as required by F.R.C.P. 26(a)(1)(A)(iii), or any documents in support thereof. (*Compare* ECF No. 14 at 4 & n.2 ("Plaintiff has indicated that there are no economic damages being sought at this time.") *and* ECF No. 48 at 5 (same) *with* ECF No. 68 at 6, § 4.) For that reason alone, Ms. Mullen cannot

establish economic damages at this point. *See* Fed. R. Civ. P. 37(c)(1). Moreover, in her deposition, Mr. Mullen admitted she is not seeking damages for any lost income or medical costs.

A live claim for nominal damages might prevent dismissal for mootness. *See*, *e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257-58 (10th Cir. 2004). Here, however, Ms. Mullen has not expressly sought nominal damages in her various pleas for damages in her complaint or in any of her calculations of damages. *See Hacker v. Dart*, 62 F.4th 1073, 1086-87 (7th Cir. 2023) (rejecting argument that Rehabilitation Act plaintiff "is free to pursue nominal damages despite not requesting them in his complaint."); *Alexander v. Riga*, 208 F.3d 419, 429 (3d Cir. 2000) (entitlement to nominal damages is not automatic). Even if she had, it is not at all clear that nominal damages are available under the Rehabilitation Act, *see Hacker*, 62 F.4th at 1087 (reserving the "challenging legal issues"), or that such an award would entitle Ms. Mullen to attorney's fees in this case, *see Farrar v. Hobby*, 506 U.S. 103, 115 (1992) (attorney's fees are not always available for nominal damages under Section 1983). In short, Ms. Mullen has not carried her burden of adducing any evidence in support of economic damages. *See Fox*, 839 F.3d at 1218-19. Sheriff Reigenborn is, therefore, entitled to summary judgment on Ms. Mullen's claim for damages. *Id.*

### B.  Ms. Mullen Has Not Established an Entitlement to Injunctive Relief.

As for injunctive relief, although Ms. Mullen requests it one time in her prayer for relief, she did not include it in the latest amended scheduling order, nor has she filed a motion at any point for the entry of such relief. If she had, such a request would be moot. A case is moot when "granting a present determination of the issues offered" has no "effect in the real world." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (quotation omitted). "An

action becomes moot if an intervening circumstance deprives the plaintiff of a personal stake at any point." *Id.* (cleaned up); *see also Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015). Mootness is a legal determination that goes to whether the Court has subject matter jurisdiction. *Brown v. Buhman*, 822 F.3d 1151, 1168 (10th Cir. 2016).

In order to obtain an injunction under the Rehabilitation Act, a plaintiff must establish she is "suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004), applied to Rehabilitation Act claim in *Reiskin v. Greyhound Lines, Inc.*, No. 20-cv-2605-WJM-NRN, 2022 WL 2374593, *13 (D. Colo. June 30, 2022). An isolated incident does not warrant injunctive relief. *See, e.g.*, *Freydel v. New York Hosp.*, No. 00-7108, 2000 U.S. App. LEXIS 31862, *19-20 (2d Cir. 2000) (affirming dismissal of Rehabilitation Act claim for injunctive relief based on one visit to a hospital). While "[p]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury[,]" the "threatened injury must be 'certainly impending' and not merely speculative." *Tandy*, 380 F.3d at 1283. Failure to establish a certainly impending injury constitutes a lack of Article III standing. *Reiskin*, 2022 WL 2374593, at *13.

As established in discovery, the Adams County detention facility already has a written policy to provide deaf inmates with an ASL interpreter. Although Ms. Mullen was not provided with one between 11:48 p.m. and 9:50 a.m. on August 24 to 25, 2020, that was due to the designated deputy being unavailable and not returning the phone call request from Deputy Stein. Ms. Mullen was provided an interpreter by the time of her first court appearance at 9:50 a.m. on August 25th. Moreover, she communicated in the interim in writing on multiple occasions with various people.

Since the fall of 2022, the Adams County detention facility switched from inhouse translation to a certified third-party ASL translation service provider, A&A Languages, LLC, that is on call 24 hours a day. Ms. Mullen has not established that it is probable, let alone imminently so, that she will be reincarcerated again and experience a similar unavailability of an ASL translator. Nor has Ms. Mullen adduced any evidence that since her incarceration in August 2020, any other inmate who has requested an ASL interpreter has not been timely provided one pursuant to the detention facility's written policies–either before or after the 2022 switch to a third-party translation service provider. *See Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 622-23 (1974) (where "an intervening change in administration" occurs, "the issuance of prospective coercive relief against the successor to the office must rest, at a minimum, on supplemental findings of fact indicating that the new officer will continue the practices of his predecessor."). Ms. Mullen, therefore, lacks standing to seek injunctive relief against Sheriff Claps, who has modified the policies complained of by Ms. Mullen.

## IV.   SHERIFF CLAPS HAS ELEVENTH AMENDMENT IMMUNITY FROM SUIT FOR CLAIMS UNDER THE REHABILITATION ACT

Eleventh Amendment immunity applies not only to a state but also to a person that is an arm of the state. *Couser v. Gay*, 959 F.3d 1018, 1023 (10th Cir. 2020). While the Supreme Court "has repeatedly refused to extend [Eleventh Amendment] sovereign immunity to counties[,]" *Northern Ins. Co. of New York v. Chatham Cty.*, 547 U.S. 189, 193 (2006), county-level officers, including county sheriffs, can receive Eleventh Amendment immunity when they exercise State, rather than county powers. *See McMillian*, 520 U.S. at 785 & 793 (holding that an Alabama county sheriff was a State, not county, "policy maker" and entitled to Eleventh Amendment immunity). That inquiry is functional. It is not a "categorical, 'all or nothing'" one, but must be determined in

"a particular area, or on a particular issue." *Id.*; *see also Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1220 n.26 (10th Cir. 2022) (same as to county prosecutor); *Nielander v. Bd. of Cty. Comm'rs of Cty. of Republic, Kan.*, 582 F.3d 1155, 1170 (10th Cir. 2009) (same as to county attorney).

Sheriffs in Colorado are independently elected state constitutional officers with jurisdictional limits tied to a geographic boundary. As such, they serve in a variety of roles. *See Struble v. Barger*, 261 P.2d 497, 498 (Colo. 1953) (referring to the office of the county sheriff serving as both an "executive officer" and an "officer of the court"). Under the Colorado Constitution, law enforcement is executive in nature. *See* Colo. Const., art. IV, § 2 (granting to Governor "supreme executive power of the state" and imposing duty to "take care that the laws be faithfully executed"); *see also Manders v. Lee*, 338 F.3d 1304, 1313 (11th Cir. 2003).

The Adams County detention facility houses pretrial inmates. Incarceration prior to a trial by the state judiciary on a state criminal charge is a State, not local, power. *See, e.g.*, *De Veau v. Braisted*, 363 U.S. 144, 153 (1960); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). By statute, the Sheriff is the sole keeper of the jail. Colo. Rev. Stat. §§ 17-26-101 to 103; *id.* at § 30-10-511; *Sisneros v. Cty. of Pueblo*, No. 09-cv-01646-PAB-MJW, 2010 WL 1782017, at *3 (D. Colo. May 3, 2010). Adams County, which is a separate legal entity, cannot interfere with the Sheriff's running of the jail. *See Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1218-1221 (10th Cir. 2002) (en banc) (treating a Sheriff as separate from the County for purposes of deputies); *Frazier v. Jordan*, No. 06-1333, 2007 U.S. App. LEXIS 696, 2007 WL 60883, at *6 (10th Cir. Jan. 10, 2007); *Richart v. Bd. of Comm'rs*, 33 P.2d 971, 972-73 (Colo. 1934); *Mullen v. Adams Cty. Bd. of Comm'rs*, No. 21-cv-02398-RM-NYW, 2022 WL 1266618, *15-24 (D. Colo. April 28, 2022); *Archuleta v. Adams Cty. Bd. of Cty. Comm'rs*, No. 07-cv-02515-MSK-CBS, 2011 WL 3799029, at *10 (D.

Colo. June 14, 2011). The Sheriff's hiring and supervision of deputies is likewise an exercise of State, not local power. *See Pellitteri v. Prine*, 776 F.3d 777, 782 (11th Cir. 2015). In accomplishing these tasks, the Adams County Sheriff is governed by various state statutes and is an instrumentality of the State, not the County.

By statute, the Sheriff's finances are derived from a variety of federal and state grants, county tax revenue, and fees for services provided. *See, e.g.*, Colo. Rev. Stat. §§ 30-10-102(1); 30-10-521. And the only reason the Sheriff could be sued under the Rehabilitation Act is because his predecessor received federal funds for the operation of the detention facility.

Thus, county sheriffs have Eleventh Amendment immunity in their official capacity for Section 1983 claims arising out of the operation of a detention facility. *See Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1288 (11th Cir. 1998) ("[A]n Alabama sheriff acts exclusively for the state rather than for the county in operating a county jail."); *Handy v. Diggins*, No. 10-cv-02022-WYD-KMT, 2011 WL 1743394, *34 (D. Colo. Mar. 23, 2011) (granting Denver Eleventh Amendment immunity for the operation of its jail); *accord Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007); *White v. Adams Cty. Detention Facility*, 1995 U.S. App. LEXIS 16574, *2-3 (10th Cir. 1995) (acknowledging but reversing grant of immunity for operation of detention facility based on pre-*Twombly* pleading standard); Thus, if the Court otherwise permits an official capacity claim against the Sheriff to proceed, it is nevertheless barred by the Eleventh Amendment.

## CONCLUSION

For the foregoing reasons, Sheriff Claps requests the Court enter summary judgment in his favor on Ms. Mullen's sole remaining Rehabilitation Act claim.

DATED: June 30, 2023

Respectfully submitted,


 *s/Michael A. Sink*
Michael A. Sink
Assistant County Attorney
Adams County Attorney's Office
4430 S. Adams County Pkwy
5th Floor, Suite C5000B
Brighton, CO  80601
Phone:  (720) 523-6116
Fax:  (720) 523-6114
msink@adcogov.org
*Counsel  for Defendant Gene Claps*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2023, the foregoing was electronically filed with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record.

Spencer J. Kontnik
Austin M. Coehn
Matthew L. Fenicle
skontnik@kontnikcohen.com
acohen@kontnikcohen.com
mfenicle@kontnikcohen.com
*Attorneys for Plaintiff*

<u>*s/Michael A. Sink*</u>
Michael A. Sink
Assistant County Attorney
Adams County Attorney's Office
4430 S. Adams County Pkwy
5th Floor, Suite C5000B
Brighton, CO  80601
Phone:  (720) 523-6116
Fax:  (720) 523-6114
msink@adcogov.org
*Counsel  for Defendant Claps*